ELIZABETH A. CHMIELEWSKI, EXECUTRIX (ESTATE
OF ROBERT E. CHMIELEWSKI) *v.* AETNA
CASUALTY AND SURETY COMPANY

AETNA CASUALTY AND SURETY COMPANY *v.*
ELIZABETH A. CHMIELEWSKI, EXECUTRIX
(ESTATE OF ROBERT E. CHMIELEWSKI)
(14100)

PETERS, C. J., CALLAHAN, GLASS, HULL and BORDEN, Js.

Argued January 15—decision released May 14, 1991

*Helen L. McGonigle,* for the appellant-appellee (Elizabeth A. Chmielewski).

*Arnold J. Bai,* with whom, on the brief, was *Philip F. von Kuhn,* for the appellee-appellant (Aetna Casualty and Surety Company).

BORDEN, J. The plaintiff, Elizabeth A. Chmielewski, executrix of the estate of Robert E. Chmielewski, appeals, and the defendant, Aetna Casualty and Surety Company, cross appeals from the judgment of the trial court that: (1) modified an underinsured motorist coverage arbitration award in favor of the plaintiff; and (2) remanded to the same arbitration panel an issue of coverage under an excess coverage policy that the arbitrators had not determined.[1] On appeal, the plaintiff claims that the trial court: (1) violated her constitutional rights to due process of law and access to the courts by failing to undertake a de novo review of certain factual determinations of the arbitrators; and (2) improperly concluded that stacking was not available and accordingly modified the award by reducing it from $1,400,000 to $500,000. On cross appeal, the defendant claims that the trial court improperly: (1) ruled that a certain exclusion from coverage provision of the policy was invalid and, therefore, did not bar the plaintiff's claim for underinsured motorist

---

[1] The plaintiff applied to the trial court to confirm the arbitration award in question and the defendant applied to the trial court to vacate the award. The trial court consolidated the two proceedings.

coverage; (2) awarded interest to the plaintiff on the award retroactive to the date of the award; and (3) remanded the case to the arbitrators. We affirm in part and reverse in part.

The following facts are not disputed. On April 14, 1987, the decedent was killed when a motorcycle owned and operated by him collided with a pickup truck. The pickup truck carried $100,000 of liability insurance, which was paid in full to the plaintiff. The decedent's motorcycle was insured by Northland Insurance Company, and carried uninsured motorist coverage limits of $20,000 per person and $40,000 per occurrence.

The decedent, the sole proprietor of a plumbing and heating business, maintained a policy, entitled "Business Auto Policy," issued by the defendant covering nine motor vehicles that were separately listed on the policy and for which separate premiums were charged. The policy provided $500,000 of uninsured and underinsured motorist coverage for each vehicle. The total annual premium for uninsured and underinsured motorist coverage for the nine vehicles was $262. The named insured on the policy was "R E Chmielewski Plumbing & Heating ATIMA."[2] The motorcycle was not listed as a covered vehicle under the policy. The decedent also maintained an excess liability policy with the defendant in the amount of $2,000,000.

The parties proceeded to compulsory arbitration pursuant to General Statutes (Rev. to 1989) § 38-175c[3]

---

[2] "ATIMA" is an abbreviation for the phrase "as their interests may appear."

[3] General Statutes (Rev. to 1989) § 38-175c provides in part: "UNINSURED MOTORIST COVERAGE. (a) (1) Every such policy shall provide insurance, herein called uninsured motorist coverage, in accordance with such regulations, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of unin-

before a panel of three arbitrators. The plaintiff claimed that she was entitled to stack the $500,000 of underinsured motorist coverage for each of the nine listed vehicles, for a total coverage of $4,500,000 under both the business auto policy and the excess policy. The defendant denied both coverage and stacking on the bases that: (1) a particular exclusionary provision in the policy applied to the plaintiff's claim; (2) § 38-175c (a) (1) authorized the policy exclusion in question; (3) the policy was a fleet policy to which stacking was not applicable; and (4) the excess policy did not apply because the decedent's motorcycle was specifically endorsed off of its coverage.

The arbitration proceedings, which began on October 24, 1988, and concluded on October 2, 1989, constituted nine days of hearings that were transcribed by a stenographer. Since the arbitration provision of

sured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom, provided each insurer licensed to write automobile liability insurance in this state shall provide such uninsured motorists coverage with limits requested by the named insured upon payment of the appropriate premium, but such insurer shall not be required to provide such coverage with limits in excess of the limits of the bodily injury coverage of such policy issued to such named insured. No insurer shall be required to provide uninsured motorist coverage to (A) a named insured or relatives residing in his household when occupying, or struck as a pedestrian by, an uninsured or underinsured motor vehicle or a motorcycle that is owned by the named insured, or (B) to any insured occupying an uninsured or underinsured motor vehicle or motorcycle that is owned by such insured. Every such policy issued on or after October 1, 1971, which contains a provision for binding arbitration shall include a provision for final determination of insurance coverage in such arbitration proceeding. With respect to any claim submitted to arbitration on or after October 1, 1983, the arbitration proceeding shall be conducted by a single arbitrator if the amount in demand is forty thousand dollars or less or by a panel of three arbitrators if the amount in demand is more than forty thousand dollars."

This section is currently located at General Statutes (Rev. to 1991) § 38a-336. We refer herein throughout to the 1989 revision.

the policy did not set a time limit within which the arbitrators had to render their decision, the parties agreed to extend to December 1, 1989, the thirty day time period for rendering an arbitration award provided by General Statutes § 52-416.[4]

On November 20, 1989, a majority of the arbitrators decided that there was coverage under the business auto policy and that stacking was permitted thereunder. They found that the policy was a "business automobile policy [that] insured nine vehicles with separate premiums paid for underinsured coverage on each vehicle." The arbitrators awarded damages to the plaintiff in the gross amount of $1,666,650, reduced by 10 percent for the comparative negligence of the decedent to $1,500,000, and further reduced by the $100,000 recovered from the tortfeasor's insurer, for a net award of $1,400,000. This amount was further reduced because the arbitrators determined that Northland had $20,000 of underinsured motorist coverage and that Northland had agreed to be bound by the arbitrators' decision regarding the extent of its payment. The arbitrators also determined that Aetna and Northland would share the credit of $100,000 proportionately to their coverage.[5] Because the award was within the

[4] General Statutes § 52-416 provides: "TIME WITHIN WHICH AWARD SHALL BE RENDERED. NOTICE. (a) If the time within which an award is rendered has not been fixed in the arbitration agreement, the arbitrator or arbitrators or umpire shall render the award within thirty days from the date the hearing or hearings are completed, or, if the parties are to submit additional material after the hearing or hearings, thirty days from the date fixed by the arbitrator or arbitrators or umpire for the receipt of the material. An award made after that time shall have no legal effect unless the parties expressly extend the time in which the award may be made by an extension or ratification in writing.

"(b) The award shall be in writing and signed by the arbitrator or arbitrators, or a majority of them, or by the umpire. Written notice of the award shall be given to each party."

[5] For this purpose, the proportional share was $4,500,000 of coverage for Aetna and $20,000 of coverage for Northland and, therefore, Aetna would have been required to pay $1,380,260 and Northland $19,780.

stacked coverage provided by the business auto policy, the arbitrators did not address the issue of coverage under the excess policy.

The plaintiff moved to confirm and the defendant moved to vacate the award. The record supplied to the trial court consisted of the arbitration agreement, the parties' written extension of time for the arbitrators to render their award, and the applications to confirm and vacate. After the parties argued the cross applications to the trial court, *Stodolink, J.,* but before the trial court had rendered its decision, the plaintiff moved to supplement the record "to allow additional evidence on the issue of ownership of the vehicles listed on the subject policy." The basis of this motion was that, after the arguments on the cross applications, this court decided *Cohn* v. *Aetna Ins. Co.,* 213 Conn. 525, 569 A.2d 541 (1990), and *Wilson* v. *Security Ins. Co.,* 213 Conn. 532, 569 A.2d 40, cert. denied,        U.S.     , 111 S. Ct. 52, 112 L. Ed. 2d 28 (1990), where we held that stacking was not available under a policy "covering a number of vehicles owned by a business . . . ." *Cohn* v. *Aetna Ins. Co.,* supra, 530; *Wilson* v. *Security Ins. Co.,* supra, 535. The plaintiff argued that she was entitled to a de novo review of the arbitrators' factual determination that the policy in question was a business automobile policy, and that she was entitled to introduce evidence to establish that it was not such a policy.

On July 13, 1990, the trial court issued its memorandum of decision on the plaintiff's motion to supplement the record and on the cross applications to confirm and vacate the award. With respect to the plaintiff's motion to supplement the record, the court recognized that under *American Universal Ins. Co.* v. *DelGreco,* 205 Conn. 178, 530 A.2d 171 (1987), it was required to undertake a de novo review of legal questions. It also

concluded that it was "under no binding precedent to conduct a de novo review of the factual finding by the arbitrators that the policy in question is one issued to a business. The court is satisfied by the record that the policy in question is a business automobile policy." The court accordingly denied the plaintiff's motion to supplement the record.

On the merits of the applications, the court rejected the defendant's claims that the policy exclusion and General Statutes (Rev. to 1989) § 38-175c (a) (1) (A) precluded coverage. The court also determined that, based on the arbitrators' finding, the policy was a fleet policy and that stacking of coverage was barred by *Cohn* v. *Aetna Ins. Co.*, supra. Thus, the court ruled, "[t]he arbitration award should be modified to reflect the maximum underinsurance coverage of $500,000 available [for one vehicle] under the business auto policy, less applicable credits and a 10 percent reduction for decedent's comparative negligence." With respect to the credit applicable as a result of the tortfeasor's insurer's payment of $100,000, the court indicated that "the most reasonable disposition of [that payment] is to have Aetna and Northland share the credit of $100,000 proportionately to their coverage[s]. While this manner of disposition is reasonable, this issue must be remanded to the arbitrators to make appropriate adjustments based on a maximum coverage under the Aetna policy of $500,000."

The court also granted the plaintiff's request for interest on the award retroactive to the date of the award, pursuant to General Statutes § 37-3a.[6] Further,

---

[6] General Statutes § 37-3a provides: "RATE RECOVERABLE AS DAMAGES. Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the deten-

the court determined that the issue of coverage under the excess policy that the arbitrators had not determined "must be remanded to the arbitration panel for their determination." Thereafter, judgments were rendered in conformity with the decision. The parties appealed and cross appealed to the Appellate Court, and we transferred the cases to this court pursuant to Practice Book § 4023.

I

STANDARD OF REVIEW

The plaintiff claims that the court improperly: (1) failed to undertake a de novo review of the factual finding of the arbitrators that the policy in question was a policy issued to a business; and (2) refused to permit her to supplement the trial court record in order to demonstrate that the policy in question was not a fleet insurance contract. Since these two claims are closely related, and since the plaintiff offers similar constitutional bases for each of the claims, we consider them together.

The plaintiff argues that the court's failure to undertake a de novo review of the arbitrators' factual finding that the policy in question was issued to a business[7]

tion of money after it becomes payable except as otherwise provided with respect to demand obligations in section 42a-3-122 (4) (a). Judgment may be given for the recovery of taxes assessed and paid upon the loan, and the insurance upon the estate mortgaged to secure the loan, whenever the borrower has agreed in writing to pay such taxes or insurance or both. Whenever the maker of any contract is a resident of another state or the mortgage security is located in another state, any obligee or holder of such contract, residing in this state, may lawfully recover any agreed rate of interest or damages on such contract until it is fully performed, not exceeding the legal rate of interest in the state where such contract purports to have been made or such mortgage security is located."

[7] Both parties and the trial court treated this determination of the arbitrators as a finding of fact, rather than as a conclusion of law. We therefore

deprived the plaintiff "of those rights secured by Section one of the 14th Amendment of the United States Constitution,[8] Article first, Section 10 of our state constitution[9] and, Article first, section 19 as amended by Article IV to the Constitution of the State of Connecticut."[10] She also argues that the same constitutional principles entitled her to supplement the trial court record by introducing evidence to establish that the policy was not a fleet insurance contract. We disagree.

We first consider the scope of the constitutional claims presented by the plaintiff. Although that scope could have been more clearly delineated, we glean from the specific references noted above and from the discussion in her brief of *American Universal Ins. Co.* v. *DelGreco*, supra, 184–91,[11] that the constitutional bases of her claim are the due process clauses of the fourteenth amendment to the United States constitution and of article first, § 10 of the Connecticut constitu-

do likewise. See *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 132, 464 A.2d 6 (1983); *Travelers Ins. Co.* v. *Hendrickson*, 1 Conn. App. 409, 411 n.3, 472 A.2d 356 (1984).

[8] The fourteenth amendment to the United States constitution provides in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

[9] The constitution of Connecticut, article first, § 10, provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[10] The constitution of Connecticut, amendment four, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law . . . ."

[11] In *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 191, 530 A.2d 171 (1987), we held that "where judicial review of compulsory arbitration proceedings required by § 38-175c (a) (1) is undertaken under General Statutes § 52-418, the reviewing court must conduct a de novo review of the interpretation and application of the law by the arbitrators."

tion, and the access to the courts clause of article first, § 10.[12] See footnotes 9 and 10, supra.[13] See *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 576 n.11, 512 A.2d 893 (1986) (although constitutional claims not as fully or clearly stated as required, this court may exercise discretion to decide such claims in order to disperse constitutional clouds over legislation where public interest best served by doing so).

We turn, therefore, to the questions of whether either due process of law or the constitutional guarantee of access to the courts requires a de novo review by the trial court of factual findings of arbitrators made in compulsory arbitration proceedings under General Statutes (Rev. to 1989) § 38-175c, and whether a party has the right to introduce evidence in the reviewing court in the course of the court's review of those findings. We conclude that such de novo review is not constitutionally required, but that the appropriate standard of review is the "substantial evidence" test that prevails in review of factual determinations by administrative agencies. We also conclude that, except in special circumstances not present in this case; compare General Statutes § 4-183 (i); a party does not have the right to introduce evidence in the reviewing court in connection with that review.

---

[12] The constitution of Connecticut, article first, § 10, is both our due process and access to the courts provision; see *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill,* 212 Conn. 83, 94, 561 A.2d 917 (1989) (access to the courts); *Katz* v. *Brandon,* 156 Conn. 521, 537, 245 A.2d 579 (1968) (due process); and has the same meaning and same limitations as the federal due process provision. See *Circuit-Wise, Inc.* v. *Commissioner of Revenue Services,* 215 Conn. 292, 307, 576 A.2d 1259 (1990).

[13] Although the plaintiff's brief also makes passing reference to a claimed violation of her right to a jury trial; see footnote 10, supra, and accompanying text; we decline to consider that claim because at no time did she claim a jury trial in the trial court; see *O'Hara* v. *State,* 218 Conn. 628, 639, 590 A.2d 948 (1991); and because she has offered absolutely no authority or analysis in support thereof.

Some history is first in order. General Statutes (Rev. to 1989) § 38-175c was first enacted in 1967 as § 4 of Public Acts 1967, No. 510. See *Roy* v. *Centennial Ins. Co.*, 171 Conn. 463, 470–71, 370 A.2d 1011 (1976). Until 1971, § 38-175c left the matter of uninsured motorist coverage almost entirely to regulation by the insurance commissioner, without any reference to arbitration of such coverage. In 1967, this court held in *Frager* v. *Pennsylvania General Ins. Co.*, 155 Conn. 270, 231 A.2d 531 (1967), that an uninsured motorist arbitration clause in a liability policy embraced only the issues of liability of the uninsured motorist and the amount of the insured plaintiff's ensuing damages, but left issues of coverage to the court. Recognizing that removing coverage issues from arbitration would have implications for the administration of justice, we rejected the contention that our holding would clog the courts with piecemeal litigation. Id., 278. We expressed confidence that the insurance commissioner's regulatory powers would be sufficient to protect the public against possible abuse by insurers, such as "involving claimants in unwarranted litigation and procedural complexities or in delaying tactics intended to bring to bear on claimants the compulsive force of economic attrition." Id., 279.

Ultimately, however, the legislature did not share that confidence, for in 1971 it enacted Public Acts 1971, No. 767, later codified in General Statutes (Rev. to 1989) § 38-175c. That section provides as follows: "Every such [automobile liability] policy issued on or after October 1, 1971, which contains a provision for binding arbitration shall include a provision for *final determination of [uninsured motorist] insurance coverage* in such arbitration proceeding." (Emphasis added.) Although the legislative history of that public act does not reveal any discussion on the floor or in committee

hearings,[14] we have regarded the 1971 amendment to § 38-175c as intended legislatively to overrule "[t]he holding in *Frager* . . . to the extent that it held that an insurer could contractually limit those issues relating to coverage which the arbitration panel could decide." *Oliva* v. *Aetna Casualty & Surety Co.,* 181 Conn. 37, 41, 434 A.2d 304 (1980). We therefore held in *Oliva* that "[t]he expressed intent and effect of the aforesaid amendment to § 38-175c is to remove from the court and to transfer to the arbitration panel the function of determining, in the first instance, all issues as to coverage under automobile liability insurance policies containing uninsured motorist clauses providing for arbitration." Id., 42. It is fair to infer, therefore, that the purposes of the arbitration provision of § 38-175c, which we have characterized as a compulsory arbitration provision; see *Wilson* v. *Security Ins. Group,* 199 Conn. 618, 626, 509 A.2d 467 (1986); were to avoid the institutional difficulty perceived by the court in *Frager,* namely, clogging the courts with piecemeal litigation, and leveling the procedural playing field by guarding against the possibility of insurers unfairly using their superior economic resources to delay the final resolution of claims by their insureds.

In *American Universal Ins. Co.* v. *DelGreco,* supra, we were confronted with the issue of the proper scope of judicial review of a decision of the arbitrators rendered pursuant to the compulsory arbitration provision of § 38-175c (a) (1). Recognizing that subjecting a compulsory arbitration award to the limited scope of review afforded a voluntary arbitration award "would in most

[14] The legislative history discloses only that Substitute House Bill No. 5627, entitled "An Act Creating a Summary Proceeding for Uninsured Motorists," which ultimately became the public act, was passed on the consent calendars of the House of Representatives and Senate at the end of the 1971 session of the General Assembly. See 14 S. Proc., Pt. 7, 1971 Sess., p. 3403; 14 H.R. Proc., Pt. 11, 1971 Sess., p. 4966.

cases be equivalent to no review at all and would be constitutionally suspect"; id., 191; we held that "where judicial review of compulsory arbitration proceedings required by § 38-175c (a) (1) is undertaken under General Statutes § 52-418, the reviewing court must conduct a de novo review of the interpretation and application of the law by the arbitrators." Id. Because in that case there was a stipulation of facts, however, we did not consider the scope of review of questions of fact determined by the arbitrators in such a compulsory arbitration proceeding.

Thereafter, in *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 212 Conn. 83, 561 A.2d 917 (1989), we were confronted with various constitutional challenges to General Statutes §§ 42-181 through 42-185, as amended in 1985 (Lemon Law II), including the claim that the limited scope of judicial review of the compulsory arbitration proceedings afforded by the legislation at issue violated our state constitutional provision regarding access to the courts. Id., 94–95. The defendants in *O'Neill* urged us to read into General Statutes § 52-418 a substantial evidence standard of review of factual determinations, in order to "meet constitutional requirements while accommodating the Lemon Law's purpose of avoiding costly litigation." Id., 96. That standard of review would have equated review of factual findings made in the process of compulsory arbitration to "the scope of judicial review afforded to administrative proceedings." Id., 95.

Recognizing the "constitutional appeal" of that position; id., 96; we were prepared to "reach for a somewhat strained construction [of §§ 42-181 and 52-418] in the service of our acknowledged obligation to implement the legislature's purpose in a manner that is both effective and constitutional, if it were reasonably clear that such a construction accorded with the legislature's

underlying intent." Id. We were constrained to reject that scope of review, however, not because it failed to meet applicable constitutional requirements but because the legislative history of General Statutes § 42-181, particularly an amendment to the Uniform Administrative Procedure Act (UAPA); chapter 54 of the General Statutes; specifically excluding Lemon Law arbitration panels from the definition of "agency," "repudiated the suggestion that the administrative appeal standard of 'substantial evidence' was intended to govern the judicial review of factfinding of Lemon Law II arbitrations." Id., 97.

In this case, however, there is no similar legislative history to suggest that the legislature has specifically excluded the administrative appeal standard of substantial evidence review from § 38-175c. Indeed, a de novo scope of review of factual questions would be inconsistent with the purposes of the compulsory arbitration provision of that section, namely, avoiding congestion of the courts with piecemeal litigation and leveling the playing field by avoiding the risks that insurers would use their superior economic resources by subjecting contested claims for coverage to undue litigation. To subject factual findings made by arbitrators under § 38-175c to de novo review by the court would, in many cases, make those proceedings merely way stations to the courts, and would thereby create the very risks that the compulsory arbitration provision was designed to avoid.

We perceive no legislative barrier, like that existing under Lemon Law II, to reading § ·38-175c so as to provide a substantial evidence standard of judicial review of factual findings, and we construe §§ 38-175c and 52-418 to incorporate that standard[15] in order to

[15] The substantial evidence test for judicial review of factual findings provides as follows: "Judicial review of an administrative agency decision

"implement the legislature's purpose in a manner that is both effective and constitutional . . . ." Id., 96. Furthermore, in order to ensure that the court is able to undertake that review effectively, we construe § 38-175c to incorporate a requirement that a record of the arbitration proceedings be preserved and made available to the court in connection with any such review.[16]

With this background in mind, we turn to the plaintiff's first constitutional challenge, namely, that she was deprived of her federal and state rights to due process of law because of the absence of de novo review of factual findings.[17] We perceive no such due process violation.

"Compulsory arbitration, per se . . . is not automatically invalid so long as fair procedures are provided by the legislature and ultimate judicial review is available." *American Universal Ins. Co.* v. *DelGreco,* supra, 189. Due process analysis requires balancing the

---

requires a court to determine whether there is substantial evidence in the administrative record to support the administrative agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* 216 Conn. 627, 639, 583 A.2d 906 (1990). "Substantial evidence" will be found to exist if the administrative record supplies a substantial basis of fact from which the court reasonably can infer the fact in issue. Id., 639–40.

This standard of review provides less room for judicial scrutiny than do the "clearly erroneous" or "weight of the evidence" rules. *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 593, 590 A.2d 447 (1991). "In determining whether an administrative finding is supported by 'substantial evidence,' a court must defer . . . to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part." *Briggs* v. *State Employees Retirement Commission,* 210 Conn. 214, 217, 554 A.2d 292 (1989); see also *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* supra, 640.

[16] In this case, such a record was preserved, although neither party deemed it necessary to present it to the court.

[17] Since our state constitutional due process clause has the same meaning as the federal; see footnote 12, supra; we consider the two together.

government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures. *Pet* v. *Department of Health Services,* 207 Conn. 346, 364, 542 A.2d 672 (1988). " 'All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard" . . . to insure that they are given a meaningful opportunity to present their case.' " Id., quoting *Mathews* v. *Eldridge,* 424 U.S. 319, 348–49, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Under this analysis, the court must consider three factors: " 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Pet* v. *Department of Health Services,* supra, quoting *Mathews* v. *Eldridge,* supra, 335.

Applying these principles to this case, we conclude that no due process violation is involved in subjecting factual findings to a substantial evidence test under General Statutes (Rev. to 1989) § 38-175c. The private interests involved are the financial interests of the plaintiff and the defendant in determining their contractual rights and obligations of coverage. Although we do not minimize the importance of their interests to them, when considered among the hierarchy of interests ordinarily asserted under the tripartite due process analysis they cannot be characterized as substantial. Compare, e.g., *Pet* v. *Department of Health Services,* supra (disciplinary action against physician); *Petrowski* v. *Norwich Free Academy,* 199 Conn. 231,

506 A.2d 139, appeal dismissed, 479 U.S. 802, 107 S. Ct. 42, 93 L. Ed. 2d 5 (1986) (termination of employment proceeding against teacher).

Nor is there a substantial risk of an erroneous deprivation of those interests by virtue of affording less than de novo review of factual findings. The substantial evidence test has governed factual findings in administrative proceedings both before and pursuant to the UAPA; see *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* 216 Conn. 627, 639–40, 583 A.2d 906 (1990) (post-UAPA); *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 322, 307 A.2d 144 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973) (*Loiselle, J.,* concurring) (pre-UAPA); and has long been regarded as constitutionally sufficient to protect the litigants' rights to due process. See *Arkansas Wholesale Grocers' Assn.* v. *Federal Trade Commission,* 18 F.2d 866, 871 (8th Cir.), cert. denied, 275 U.S. 533, 48 S. Ct. 30, 72 L. Ed. 411 (1927); see also 2 Am. Jur. 2d, Administrative Law § 621. Moreover, although uninsured motorist coverage is not directly subject to an administrative hearing process, we have recognized that "[t]he automobile liability insurance business [of which uninsured motorist coverage is a part] is one which is extensively regulated." *Roy* v. *Centennial Ins. Co.,* supra, 473.

Furthermore, unlike voluntary arbitration, where no record of the arbitration proceeding is required, we require that under § 38-175c such a record must be made and preserved. Moreover, the arbitrators appointed under chapter 909 of the General Statutes; General Statutes §§ 52-408 through 52-424, governing arbitration proceedings; to hear uninsured motorist coverage disputes under § 38-175c must swear "to hear and examine the matter in controversy faithfully and fairly

and to make a just award according to the best of their understanding"; General Statutes § 52-414 (d); must postpone any hearing "for good cause shown"; General Statutes § 52-413; may issue subpoenas for the attendance of witnesses and for the production of other evidence; General Statutes § 52-412 (a); and must render their award within applicable time limits. General Statutes § 52-416. In addition, the legal bases of their decisions are subject to de novo review by the court; *American Universal Ins. Co.* v. *DelGreco,* supra; and review of questions of law includes challenges to arbitral decisions on the grounds of corruption, fraud, undue means or partiality, and inquiry into whether the arbitrators have exceeded their powers or imperfectly executed them. General Statutes § 52-418 (a).

Finally, the state has a substantial interest, as expressed in the compulsory arbitration provision of § 38-175c, in providing a procedure for the resolution of uninsured motorist coverage disputes that is ordinarily less costly and more timely than traditional litigation. This procedure, moreover, avoids the additional burdens on the judicial process and the risks of economic overbearing by insurers that would be inherent in a de novo review of factual findings.

We recognize that other courts in other contexts have held compulsory arbitration statutes violative of due process in the absence of de novo judicial review. See, e.g., *Dorchy* v. *Kansas,* 264 U.S. 286, 288, 44 S. Ct. 323, 68 L. Ed. 686 (1924); *Mengel Co.* v. *Nashville Paper Products & Specialty Workers Union,* 221 F.2d 644, 647 (6th Cir. 1955); *Simon* v. *St. Elizabeth Medical Center,* 3 Ohio Op. 3d 164, 167, 355 N.E.2d 903 (1976); *Smith Case,* 381 Pa. 223, 230, 112 A.2d 625, appeal dismissed, 350 U.S. 858, 76 S. Ct. 105, 100 L. Ed. 762 (1955). None of those cases, however, has differentiated between de novo review of legal and factual questions.

In any event, we find more persuasive the reasoning of those cases that have found no due process violation where factual findings made in compulsory arbitration proceedings are made subject to judicial review on the basis of a substantial evidence standard; *Mount St. Mary's Hospital* v. *Catherwood,* 26 N.Y.2d 493, 508–509, 260 N.E.2d 508, 311 N.Y.S.2d 863 (1970); or a standard closely akin thereto. *Trustees of Amalgamated Ins. Fund* v. *Geltman Industries, Inc.,* 784 F.2d 926, 928–29 (9th Cir.), cert. denied, 479 U.S. 822, 107 S. Ct. 90, 93 L. Ed. 2d 42 (1986) (under federal Multiemployer Pension Plan Amendments Act of 1980, arbitrators' factual findings presumptively correct and may be rebutted by clear preponderance of evidence); *Republic Industries, Inc.* v. *Teamsters Joint Council,* 718 F.2d 628, 639–40 (4th Cir. 1983) (same).

We next consider the plaintiff's claim that, absent de novo review of the factual findings of the arbitrators, compulsory arbitration pursuant to § 38-175c runs afoul of her right to access to the courts under article first, § 10. We disagree.

We assume that, for purposes of this constitutional analysis, the plaintiff's claim against the defendant for underinsured motorist coverage is equivalent to a cause of action for breach of contract and, as such, falls within that class of rights that "we have referred to as . . . constitutionally incorporated common-law right[s]." *Gentile* v. *Altermatt,* 169 Conn. 267, 284, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). While the legislature may not constitutionally abolish such a right entirely, it "retains the power to provide reasonable alternatives to the enforcement of such [a right]." Id., 286; see also *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 585, 512 A.2d 893 (1986). Providing for judicial review of factual findings pursuant to a substantial evidence standard is such a reasonable alternative.

First, uninsured motorist coverage disputes arise within the context of the extensively regulated automobile liability insurance business. *Roy* v. *Centennial Ins. Co.,* supra. Thus, it is constitutionally appropriate to treat factual findings made by arbitrators under § 38-175c as analogous to those made in the course of contested administrative proceedings under the UAPA.

Second, there are adequate safeguards surrounding the arbitration process to ensure the integrity of that factfinding process. A record must be made and preserved for the trial court's use in undertaking the review process. The arbitrators must be sworn to perform their task faithfully, they must render their decision in a timely manner, and their decision will not stand if it is the product of fraud, corruption, partiality or other misconduct, or if it exceeds their powers. See General Statutes §§ 52-414 through 52-418.

Finally, the aggregate benefits associated with compulsory arbitration under § 38-175c are sufficient to insulate that statute from successful constitutional attack under article first, § 10. Those benefits are that the parties are spared the delay and some of the expense attendant on litigation, and insureds are spared the risk that their insurers will use their superior economic resources unfairly to render the arbitration process simply as a first step in the de novo review process, thereby requiring relitigation of the underlying facts upon judicial review.

Much the same reasoning disposes of the plaintiff's claim that she was entitled to introduce new evidence in the trial court in order to establish that the policy in question was not a business policy. Permitting a litigant under circumstances not sanctioned by the analogous provisions of the UAPA; General Statutes § 4-183 (i); to supplement the arbitration record by

presenting evidence to the trial court that was not presented to the arbitrators would be inconsistent with the purposes of § 38-175c and with the substantial evidence scope of judicial review of the arbitrators' findings. Furthermore, contrary to the plaintiff's assertion, this record discloses that the issue ultimately decided by this court in *Cohn* v. *Aetna Ins. Co.,* supra, was squarely before the arbitrators in this case.[18] Thus, the plaintiff had the opportunity to persuade the arbitrators that as a factual matter the policy in question was not a fleet policy within the meaning of *Cohn.*

In this case, the trial court did not specifically decide whether there was substantial evidence to support the arbitrators' determination that the policy was a fleet policy. Instead, it reviewed the record presented to it and stated that it was "satisfied by the record that the policy in question is a business automobile policy." That lacuna in the court's analysis is not fatal to its judgment, however, because the question of whether a factual finding is supported by substantial evidence is ultimately a question of law subject to de novo review by this court. See *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* supra, 639; *Briggs* v. *State Employees Retirement Commission,* 210 Conn. 214, 217–18, 554 A.2d 292 (1989); *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 539–42, 525 A.2d 940 (1987). Our independent review of the record presented to the trial court persuades us that the critical factual determination was supported by substantial evidence: the policy is labeled a "Business Auto Policy"; the named insured is "R E Chmielewski Plumbing & Heating"; and the policy covers nine separately described vehicles. The policy in question is, therefore, a fleet policy.

[18] The arbitrators in their decision specifically agreed with the reasoning of the trial court in *Cohn* v. *Aetna Ins. Co.,* Superior Court, judicial district of New Haven, Docket No. CV85238254S (December 21, 1988), that "allowed the stacking of 22 commercial vehicles . . . ."

## II

### THE PLAINTIFF'S APPEAL

The plaintiff next claims that the trial court improperly precluded her from stacking the underinsured motorist coverage under the policy because the policy was not a "fleet insurance contract" as we defined that phrase in *Cohn* v. *Aetna Ins. Co.,* supra, 530. We disagree.

In *Cohn,* we held (p. 530) that "[t]he notion of 'stacking' as an objectively reasonable expectation of the parties does not, however, extend to fleet insurance contracts. In using the phrase 'fleet insurance contracts' we specifically refer to any insurance policy designated as a 'fleet' or 'garage' policy, or any insurance policy covering a number of vehicles *owned by a business,* a governmental entity, or an institution. See 25 A.L.R.4th 896 (1983)." (Emphasis added.) The plaintiff argues that the vehicles listed on the policy were not owned by a business within that definition because title to them was in the decedent's name rather than a corporate name and, therefore, there was no separate entity that "owned" them.

We agree with the plaintiff that property owned by an individual in a trade name is nonetheless owned by him. See generally *Samples* v. *Georgia Mutual Ins. Co.,* 110 Ga. App. 297, 299, 138 S.E.2d 463 (1964). We also agree that one who operates a business under a trade name is nonetheless an individual insured under a policy issued in that trade name. See *O'Hanlon* v. *Hartford Accident & Indemnity Co.,* 639 F.2d 1019, 1025 (3d Cir. 1981). Indeed, although the named insured on the policy in this case was "R E Chmielewski Plumbing & Heating," the defendant stipulated before the arbitrators that the decedent was a "named insured" on the policy.

We conclude, however, that the trial court properly determined that the policy in question was a fleet insurance contract as we used that term in *Cohn*.[19]

When, in *Cohn*, we included within the definition of a fleet insurance contract "any insurance policy covering a number of vehicles *owned by a business*"; (emphasis added) *Cohn* v. *Aetna Ins. Co.*, supra, 530; we did not intend the word "owned" to be a term of art referring to the location of the legal title to the vehicles in question, as the plaintiff's argument suggests. The definition was drawn from an annotation in 25 A.L.R.4th (1983). The cases cited in that annotation included several where the vehicles were owned by an individual doing business as a sole proprietorship and yet were collected under the definition of a fleet insurance contract. See, e.g., *Gallups* v. *Aetna Casualty & Surety Co.*, 513 F. Sup. 1074 (N.D. Ala. 1981); *General Mutual Ins. Co.* v. *Gilmore*, 294 Ala. 546, 319 So. 2d 675 (1975); *Lumbermens' Mutual Casualty Co.* v. *Martin*, 399 So. 2d 536 (Fla. App.), review denied, 408 So. 2d 1094 (1981); *Holland* v. *Hawkeye Security Ins. Co.*, 230 N.W.2d 517 (Iowa 1975); *Yeager* v. *Auto-Owners Ins. Co.*, 335 N.W.2d 733 (Minn. 1983); *American States Ins. Co.* v. *Milton*, 89 Wash. 2d 501, 573 P.2d 367 (1978).

Furthermore, the question is not whether the named insured is a corporation or a sole proprietorship, but whether stacking is consistent with the rationale underlying the preclusion of stacking for fleet insurance poli-

[19] The plaintiff claims that the inclusion of "ATIMA" indicates that both the decedent and his proprietorship, "as their interests may appear," were named insureds and that, therefore, "[t]he Defendant should be estopped from denying that the automobiles listed on the 'Business Auto Policy' were not owned by Robert Chmielewski, individually." Since we conclude that the determination of whether the policy in question was a fleet insurance policy does not turn on the location of the legal title to the covered vehicles, but on the reasonable expectations of the parties to the policy, this claim does not advance the plaintiff's case.

cies as expressed in *Cohn* v. *Aetna Ins. Co.,* supra. Application of that rationale to the facts of this case leads us to conclude that the policy in question should be viewed as a fleet policy.

That rationale is based on the "objectively reasonable expectation[s] of the parties" to the insurance policy. *Cohn* v. *Aetna Ins. Co.,* supra, 530. In that case, there was a business automobile policy insuring twenty-two vehicles owned by a corporation. Id., 526. The plaintiff was the conservator of the estate of his wife, who had been injured while operating one of the vehicles. Id., 527. The plaintiff sought to stack, for his wife's benefit, the underinsured motorist coverage in the amount of $40,000 for all twenty-two of the vehicles covered by the policy, for a total coverage of $880,000 for each of the twenty-two vehicles. Id., 531. Focusing on the expectations of both the named insured and the insurer, we held that stacking was not within the parties' reasonable expectations because it would have produced "the unlikely result that the principals of [the corporate named insured] and [the insurer] contemplated that [the named insured] was purchasing $19,360,000 worth of uninsured or underinsured coverage for a premium of $73." Id.

Implicit in that calculation was the recognition that, in measuring the reasonable expectations of the parties, the court cannot view the particular insured and the vehicle in isolation but must hypothesize the total amount of coverage necessitated by the plaintiff's claim of stacking. Under the plaintiff's claim, therefore, we assumed that had all twenty-two of the vehicles been on the road simultaneously the total coverage would have been, not simply $40,000 x 22, or $880,000, as claimed by the plaintiff, but $40,000 x 22 x 22, or $19,360,000. Id.; see also *Howell* v. *Harleysville Mutual Ins. Co.,* 305 Md. 435, 442, 505 A.2d 109 (1986). Such

an amount of coverage for a total premium of $73 was not within the parties' reasonable expectations. *Cohn* v. *Aetna Ins. Co.,* supra, 531.

Similarly, in this case the plaintiff seeks to multiply the $500,000 worth of coverage for any one vehicle by the nine vehicles listed on the policy, for a total claimed underinsured motorist coverage of $4,500,000. As *Cohn* teaches, however, in measuring the reasonable expectations of the parties we cannot view the plaintiff's claim in isolation; rather, we must hypothesize that each covered vehicle would be afforded an identical amount of coverage. Id. Thus, if all of the covered vehicles were on the road simultaneously, the total available coverage would be $500,000 x 9 x 9, or $40,500,000, for a total premium of $262. Such an expectation is as unreasonable as was that of the plaintiff in *Cohn.*

The plaintiff argues alternatively that, even if the policy in question is regarded as a fleet policy, "stacking should still be permitted for a named insured in a noncorporate context." This argument is based on the underlying argument that insureds should be divided into so-called "class I" insureds, consisting of the named insured and his relatives residing in his household, and "class II" insureds, consisting of other insureds, such as employees of the named insured, because "[i]t is the reasonable expectation of the named insured, or class I insured, to stack coverage even on a 'fleet' policy." This argument is without merit.

"We have rejected attempts to limit 'stacking' principles to different classifications of covered individuals, rejecting the notion that there is a contractual distinction between the 'named insured' and vehicle 'occupants.' *Allstate Ins. Co.* v. *Ferrante,* 201 Conn. 478, 484–88, 518 A.2d 373 (1986)." *Cohn* v. *Aetna Ins. Co.,* supra, 528–29. We see no reason to do otherwise on

the facts of this case. Furthermore, as *Cohn* also teaches, determining whether stacking is permitted in this context requires an inquiry into the reasonable expectations of both the named insured and the insurer. Id., 531. The plaintiff's recourse to the purported reasonable expectations of the named insured ignores the broader reasonable expectations analysis employed above and in *Cohn* that would lead, contrary to the plaintiff's argument, to a result far beyond the reasonable expectations of the parties to the policy.

## III

### The Defendant's Cross Appeal

#### A

The defendant first raises three closely related claims[20] that involve the relationship between an exclusion in the policy[21] and a portion of the uninsured motorist statute, namely, General Statutes (Rev. to 1989) § 38-175c (a) (1) (A). The defendant argues that the exclusion is permitted by the statute and that it excludes underinsured motorist coverage entirely in this case, without regard to whether such coverage may be stacked. We disagree.

---

[20] The defendant's claims are that the trial court improperly ruled that: (1) the policy exclusion in issue was invalid; (2) the policy exclusion, when read in conjunction with General Statutes (Rev. to 1989) § 38-175c (a) (1), did not effectively bar coverage in this case; and (3) the plaintiff's claim for coverage was not barred by General Statutes (Rev. to 1989) § 38-175c (a) (1). As the defendant acknowledges, these claims "are plainly interrelated," and the defendant treated them as such in its brief. Accordingly, we treat them together as well.

[21] Section C.3 of an endorsement to the uninsured motorists insurance part of the policy provides as follows: "C. WE WILL NOT COVER—EXCLUSIONS

"This insurance does not apply to . . . 3. *Bodily injury* sustained by *you* or any *family member* while *occupying* or struck by any vehicle owned by *you* or any *family member* which is not a covered *auto*." (Emphasis in original.)

The defendant presents several arguments in support of its claim, to which the plaintiff offers several responses. It is not necessary, however, to go through the process of tracking the policy and statutory exclusions in this case because all of the defendant's arguments hinge on its assertion that § 38-175c (a) (1) (A) authorizes this particular policy exclusion, and we conclude to the contrary.

General Statutes (Rev. to 1989) § 38-175c (a) (1) (A) provides in pertinent part that "[n]o insurer *shall be required to provide* uninsured motorist coverage to (A) a named insured or relatives residing in his household when occupying, or struck as a pedestrian by, an uninsured or underinsured motor vehicle or a motorcycle that is owned by the named insured . . . ." (Emphasis added.) See footnote 3, supra. In contrast, the previous sentence of § 38-175c (a) (1) provides that "each insurer licensed to write automobile liability insurance in this state *shall provide such uninsured motorists coverage* with limits requested by the named insured upon payment of the appropriate premium, but the insurer *shall not be required to provide such coverage* with limits in excess of the limits of the bodily injury coverage of such policy issued to the named insured." (Emphasis added.) These differences in statutory language—"shall provide," as opposed to "[n]o insurer shall be required to provide" and an insurer "shall not be required to provide"—persuade us that, as the plaintiff argues and as the trial court determined, the language of § 38-175c (a) (1) (A) is permissive; it permits but does not mandate an insurer to provide for such a limitation of coverage in any policy that the insurer issues. That does not mean, however, that, simply because a given fact pattern falls within both the language of the statutory exclusion and a particular policy exclusion, no matter how phrased, both exclusions will

apply without regard to whether the policy exclusion was designed to take advantage of the statutory exclusion or whether the two are substantially congruent.

When an insurer seeks to limit its liability for uninsured or underinsured motorist coverage based on the regulation issued pursuant to § 38-175c, it may do so only to the extent that the regulation "expressly authorizes."[22] *Allstate Ins. Co.* v. *Ferrante,* supra, 483; see also *Nicolletta* v. *Nationwide Ins. Co.,* 211 Conn. 640, 647–48, 560 A.2d 964 (1989). Similarly, where an insurer seeks to limit its liability based on the statute itself, rather than on the regulation, it should only be permitted to do so to the extent that the statute expressly authorizes. In order for a policy exclusion to be "expressly authorized" by the statute, there must be substantial congruence between the statutory provision and the policy provision. That congruence is lacking here.

The statutory permission to the insurer to limit its liability for such coverage applies where (1) a named insured or his resident relative (2) occupies or is struck as a pedestrian by (3) "an uninsured or underinsured motor vehicle or a motorcycle" (4) owned by the named insured. General Statutes (Rev. to 1989) § 38-175c (a) (1) (A). The policy exclusion at issue in this case applies where (1) the named insured or his resident relative[23] (2) occupies

---

[22] Although we stated in *Allstate Ins. Co.* v. *Ferrante,* 201 Conn. 478, 483, 518 A.2d 373 (1986), that "an insurer may not, by contract, reduce its liability for such uninsured or underinsured motorist coverage except as § 38-175a-6 of the Regulations of Connecticut State Agencies expressly authorizes," if the statute, as opposed to the regulation, permits an exclusion that a policy has incorporated, such an exclusion would be valid notwithstanding that the regulation may not have expressly incorporated it. Our statement in *Allstate Ins. Co.* was made in the context of issues regarding stacking of coverage for more than one passenger car; id., 481; and did not mean that the insurance commissioner could obviate a statutorily permitted limitation of coverage simply by failing to issue a regulation in support thereof.

[23] The policy defines "family member" to mean a related person who is a resident of the household of the named insured.

or is struck by (3) any vehicle owned by the named insured (4) which is not a covered auto under the policy. Thus, although there are substantial similarities between the terms of the statute and the policy exclusion, there are also substantial dissimilarities: whereas the statute requires that the vehicle be uninsured or underinsured, the policy does not; whereas the statute requires that the named insured or resident relative be struck "as a pedestrian," the policy requires only that they be "struck"; and whereas the policy exclusion requires that the vehicle not be covered under the policy, the statute does not.

A "limitation of liability on uninsured or underinsured motorist coverage must be construed most strongly against the insurer." *American Universal Ins. Co.* v. *DelGreco,* supra, 196. Furthermore, any ambiguity in policy language regarding coverage must be construed against the insurer. *Avis Rent A Car System, Inc.* v. *Liberty Mutual Ins. Co.,* 203 Conn. 667, 672, 526 A.2d 522 (1987). In light of these well established principles, and in light of the permissive nature of the statutory limitation, we conclude that the policy exclusion at issue here was not authorized by the statutory exclusion and did not operate to exclude coverage in this case.

## B

The defendant next claims that the trial court abused its discretion in awarding interest on the award to the plaintiff retroactive to the date of the award. The defendant argues that "since the arbitration award was excessive, the defendant clearly acted prudently in refusing to pay" it and, therefore, the defendant's detention of the money could not have been wrongful. We are unpersuaded.

We have today decided that a trial court has discretion, under General Statutes § 37-3a,[24] to award pre-

---

[24] See footnote 6, supra, for full text of statute.

judgment interest on an arbitration award retroactively to some date prior to the date of the trial court's judgment affirming the award. *Middlesex Mutual Assurance Co.* v. *Walsh,* 218 Conn. 681, 701, 590 A.2d 957 (1991). Implicit in that determination is the conclusion that the prior date may be the date of the arbitration award. We also reasserted the well established propositions that § 37-3a provides for interest on money detained after it becomes due and payable, that the question under that statute is whether the money was wrongfully withheld, and that the ultimate determination " 'is one to be made in view of the demands of justice rather than through the application of any arbitrary rule.' " Id., 702, quoting *Cecio Bros., Inc.* v. *Feldmann,* 161 Conn. 265, 275, 287 A.2d 374 (1971). It is equally well established that we will not overrule the trial court's award of interest absent a clear abuse of discretion. *Metcalfe* v. *Talarski,* 213 Conn. 145, 160, 567 A.2d 1148 (1989).

The fact that the ultimate award, as determined by the trial court and by this court, is considerably less than that awarded by the arbitrators does not necessarily mean, as the defendant's argument suggests, that the trial court could not exercise its discretion to award interest on that portion of the award that was upheld by the trial court and this court. The defendant has claimed throughout the litigation that there was no coverage whatsoever, and has had the use of the money throughout. Thus, we cannot say that the trial court abused its discretion in its award of interest retroactive to the date of the arbitration award.

C

We consider together the defendant's final claim, namely, that the trial court improperly remanded the case to the arbitrators, and the plaintiff's agreement with that claim, albeit on different grounds and with

a different proposed result. These claims arise out of the trial court's orders that: (1) the award be modified, rather than confirmed or vacated, to reflect a maximum potential coverage under the policy of $500,000, "less applicable credits and a 10 percent reduction for decedent's comparative negligence"; (2) the issue of the applicable credit attributable to the $100,000 of coverage from the tortfeasor's policy be remanded to the original arbitrators for adjustment based on the $500,000 maximum coverage; and (3) the issue of coverage under the excess policy be remanded to those arbitrators for their determination.

The defendant claims that, the court's disclaimer to the contrary notwithstanding, it did not "modify" the award, as the term "modify" is used in General Statutes § 52-419,[25] but rather vacated it and then improperly remanded it in violation of the time constraints for remand provided in General Statutes § 52-418 (b).[26] The plaintiff agrees that the trial court did not have the authority to remand the case to the original arbitrators because the time period for remand under § 52-418 (b) had passed. The plaintiff argues, however,

---

[25] General Statutes § 52-419 provides: "MODIFICATION OR CORRECTION OF AWARD. (a) Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated, or, when the court is not in session, any judge thereof, shall make an order modifying or correcting the award if it finds any of the following defects: (1) If there has been an evident material miscalculation of figures or an evident material mistake in the description of any person, thing or property referred to in the award; (2) if the arbitrators have awarded upon a matter not submitted to them unless it is a matter not affecting the merits of the decision upon the matters submitted; or (3) if the award is imperfect in matter of form not affecting the merits of the controversy.
"(b) The order shall modify and correct the award, so as to effect the intent thereof and promote justice between the parties."

[26] General Statutes § 52-418 (b) provides: "If an award is vacated and the time within which the award is required to be rendered has not expired, the court or judge may direct a rehearing by the arbitrators."

that because the trial court could have decided the issue of the excess policy coverage, it would be unfair to require her now to rearbitrate that issue, and that we should decide that issue in her favor on the basis of the record before us. We agree with both parties that the trial court lacked the authority to remand the case to the original panel of arbitrators. We disagree with the defendant that the court did not modify the award. We conclude that it did modify the award and that it had the authority to do so. We further determine that it should have modified the award further to reflect the credits attributable to the tortfeasor's policy and to the decedent's comparative negligence. Finally, we disagree with the plaintiff that either the trial court or this court should decide the issue of the excess policy coverage in the first instance.

We first consider the defendant's arguments that the court did not modify the award pursuant to § 52-419 but vacated it pursuant to § 52-418, and that it improperly remanded the case to the arbitrators. We conclude that under the circumstances here, where the award was rendered in a compulsory arbitration proceeding, the court must be regarded as having modified it pursuant to § 52-419, and that the court improperly remanded the case to the original panel of arbitrators pursuant to § 52-418.

General Statutes § 52-419 (a) (1); see footnote 25, supra; provides in pertinent part that the court shall modify or correct an award "[i]f there has been an evident material miscalculation of figures or an evident material mistake in the description of any person, thing or property referred to in the award . . . ."[27] Section

[27] General Statutes § 52-419 (a) (2) and (3) refer to situations where, in subsection (2), "the arbitrators have awarded upon a matter not submitted to them unless it is a matter not affecting the merits of the decision upon the matters submitted," and, in subsection (3), "the award is imper-

52-419 (b) provides: "The order shall modify and correct the award, so as to effect the intent thereof and promote justice between the parties."

Although the language of § 52-419 (a) can be read narrowly, the court's role of reviewing the legal determinations of arbitrators de novo and their factual determinations under the substantial evidence standard requires that the statute be given a more expansive meaning, so as to encompass this case, where the court properly upheld the arbitrators' factual findings and properly reversed their legal determination. Unlike the court's more limited role in reviewing voluntary arbitration awards, where the court in most cases simply compares the award to the submission, in a compulsory arbitration case the court must have the authority to enter an appropriate order modifying the award so as to reflect those factual findings and that legal determination, and thus to effect the intent of the award as it should have been rendered under the law and to promote justice between the parties. General Statutes § 52-419 (b). Otherwise, the legislature's purposes in entrusting uninsured motorist coverage matters to compulsory arbitration under § 38-175c would be frustrated. We conclude, therefore, that insofar as the trial court modified the award to reflect that the maximum coverage under the policy was $500,000, rather than $4,500,000 as determined by the arbitrators, the court acted within its authority under § 52-419 (a) (1).

Furthermore, the court should also have modified the award to reflect the decedent's comparative negligence and the credit applicable to the tortfeasor's coverage. Both these issues were decided by the arbitrators, nei-

fect in matter of form not affecting the merits of the controversy." Neither of these provisions can be read as applicable to this case. The award was unarguably within the matters submitted to them, and any imperfection in it affected the merits of the controversy.

ther was contested by the parties in the trial court, and they required only undisputed mathematical calculations. The court had ample authority under § 52-419 (a) (1), as we have construed it, to include those calculations in its modification.

We agree, however, that the court exceeded its authority under § 52-418 when, on July 13, 1990, it remanded the case to the original panel of arbitrators for their determination of the excess policy coverage issue. Section § 52-418 (b) provides: "If an award is vacated and the time within which the award is required to be rendered has not expired, the court or judge may direct a rehearing by the arbitrators." We need not decide in this case whether the court's order constituted a vacation of the award, as well as a modification. Assuming without deciding that the court in effect also vacated the award, the time within which the original award was required to be rendered had long expired when the court remanded the case to the arbitrators. The final date for the arbitrators' award was December 1, 1989. Absent an agreement of the parties, the specific terms of § 52-418 (b) prohibited the court from remanding the case to the original panel of arbitrators, and any issues not decided by that panel will necessarily have to be decided by a new panel. See *Aetna Life & Casualty Co.* v. *Bulaong,* 218 Conn. 51, 64, 588 A.2d 138 (1991).

Implicit in this discussion is our rejection of the plaintiff's claim that the trial court or this court should decide the excess policy coverage issue. Since the plaintiff claims that the excess policy "is subject to the provisions of our uninsured motorist coverage statute," she cannot substitute an initial judicial determination of such coverage for the compulsory arbitration proceeding mandated by General Statutes (Rev. to 1989) § 38-175c.

The judgment is affirmed in part and reversed in part, and the case is remanded with direction to modify the judgment by (1) further modifying the award so as to reflect the decedent's comparative negligence and the credit attributable to the tortfeasor's policy, and (2) vacating the order for remand to the arbitrators.

In this opinion the other justices concurred.