MICHAEL VITANZA *v.* AMICA MUTUAL INSURANCE
COMPANY ET AL.
(AC 22913)

Lavery, C. J., and Bishop and Peters, Js.

Argued February 24—officially released May 6, 2003

*Anthony B. Corleto*, with whom, on the brief, was *Dharman P. Niles*, for the appellant (named defendant).

*Wesley M. Malowitz*, with whom, on the brief, were *Russell J. Berkowitz* and *Lisa Kessler*, for the appellee (plaintiff).

*Philip F. von Kuhn*, for the appellee (defendant Hartford Insurance Company of the Midwest).

*Opinion*

PETERS, J. Connecticut law requires all personal automobile insurance policies to include coverage for injuries caused by uninsured or underinsured motorists.[1] General Statutes § 38a-334 et seq. An insurer may, however, limit such coverage, in accordance with applicable regulations, if the policy states any such limitation expressly and unambiguously. *Streitweiser* v. *Middlesex Mutual Assurance Co.*, 219 Conn. 371, 377, 593 A.2d 498 (1991); *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 198, 530 A.2d 171 (1987). This case arises out of reparations payments that an insurer was required to make under the law of New York, the state in which the insured was injured. The insurer claims that these payments reduce its Connecticut uninsured

---

[1] For the sake of convenience, we will refer to uninsured motorists coverage as encompassing both uninsured and underinsured motorists.

motorists coverage either under the terms of its Connecticut reparations benefits policy or under the provision of a Connecticut regulation permitting reductions for medical expenses. The trial court concluded that neither of these reductions was applicable and that the insured was therefore entitled to the full amount of uninsured motorists coverage stated in the policy. We affirm the judgment of the trial court.

The plaintiff, Michael Vitanza, brought an action to recover uninsured motorists benefits from his primary insurer, the defendant Amica Mutual Insurance Company (Amica).[2] He also named as a defendant his secondary insurer, the Hartford Mutual Insurance Company of the Midwest (Hartford),[3] to recover uninsured motorists benefits for losses that exceeded those covered by his Amica policy.[4] His claim arose out of an accident in White Plains, New York, in which he was seriously injured by an uninsured motorist. Amica filed a counterclaim for a declaratory judgment to determine whether the plaintiff was entitled to the full amount of $100,000 in uninsured motorists coverage that was stated in the Amica policy. Amica alleged that its uninsured motorists coverage, although $100,000 on its face, was reduced by $50,000 in reparations benefits in the form of medical benefits that New York law had required it to pay on behalf of the plaintiff.[5] New York no fault

[2] The plaintiff is the named insured for this insurance policy.

[3] The named insured for this policy is the plaintiff's mother. The plaintiff has coverage under this policy because he resides in his mother's home.

[4] The amount of the plaintiff's losses has not as yet been determined. The plaintiff may well have a claim for economic as well as noneconomic losses that he has incurred.

[5] For the sake of convenience, we assume that, if Amica is entitled to any offset for payment of New York reparation benefits, the amount of the offset is $50,000. Amica has in fact paid $49,892.50 for the benefit of the plaintiff, of which $47,021.50 was paid as direct indemnity to physicians, hospitals and others for medical expenses. It acknowledges that New York law obligates it to pay further reparations benefits of $2979.50 for the plaintiff's medical expenses.

automobile insurance law makes the payment of such benefits mandatory even for injuries received by a non-resident such as the plaintiff.[6] Amica is authorized to issue automobile insurance policies in New York.[7]

In the absence of any disputed questions of material fact on Amica's counterclaim, both Amica and Hartford filed motions for summary judgment. The plaintiff

---

[6] The relevant New York statutes are N.Y. Insurance Law §§ 5103 and 5107 (McKinney (2000). Section 5103 (a) provides in relevant part: "Every owner's policy of liability insurance issued on a motor vehicle in satisfaction of the requirements of article six or eight of the vehicle and traffic law shall also provide for . . . the payment of first party benefits to . . .

"(2) The named insured and members of his household, other than occupants of a motorcycle, for loss arising out of the use or operation of (i) an uninsured motor vehicle or motorcycle, within the United States, its territories or possessions, or Canada; and (ii) an insured motor vehicle or motorcycle outside of this state and within the United States, its territories or possessions, or Canada."

New York Insurance Law § 5102 (b) (McKinney 2000) defines first party benefits as "payments to reimburse a person for basic economic loss on account of personal injury arising out of the use or operation of a motor vehicle, less:

"(1) Twenty percent of lost earnings . . .

"(2) Amounts recovered or recoverable on account of such injury under state or federal laws providing social security disability benefits, or workers' compensation benefits, or disability benefits under article nine of the workers' compensation law, or medicare benefits, other than lifetime reserve days and provided further that the medicare benefits utilized herein do not result in a reduction of such person's medicare benefits for a subsequent illness or injury.

"(3) Amounts deductible under the applicable insurance policy."

[7] New York Insurance Law § 5107 (a) (McKinney 2000) provides: "Every insurer authorized to transact or transacting business in this state, or controlling or controlled by or under common control by or with such an insurer, which sells a policy providing motor vehicle liability insurance coverage or any similar coverage in any state or Canadian province, shall include in each such policy coverage to satisfy the financial security requirements of article six or eight of the vehicle and traffic law and to provide for the payment of first party benefits pursuant to subsection (a) of section five thousand one hundred three of this article when a motor vehicle covered by such policy is used or operated in this state.

"(b) Every policy described in subsection (a) hereof shall be construed as having the coverage required by subsection (a) of section five thousand one hundred three of this article."

joined in the motion filed by Hartford. The trial court granted the motion for summary judgment filed by Hartford and the plaintiff.[8]

The court held that the issues raised by the counterclaim were governed by Connecticut law[9] and that, under our law, the plaintiff was entitled to the full amount of $100,000 uninsured motorists coverage that he had purchased from Amica. The court rejected Amica's argument that the medical benefits payments it had made under New York's no fault reparations law entitled Amica to a reduction under any of the terms of the policy. It further concluded that "Amica did not draft its policy of insurance to provide for a reduction of [uninsured motorists] benefits . . . ." It therefore rendered a declaratory judgment in favor of the plaintiff and Hartford. Amica has appealed.[10]

Amica's appeal raises questions of law about the construction of the insurance policies that it issued to the plaintiff. Accordingly, our review is plenary. *Israel* v. *State Farm Mutual Automobile Ins. Co.*, 259 Conn. 503, 507, 789 A.2d 974 (2002); *Garcia* v. *ITT Hartford Ins. Co.*, 72 Conn. App. 588, 592, 805 A.2d 779 (2002).

As at trial, Amica's principal contention on appeal is that the $50,000 it paid as reparations payments under New York law should reduce the plaintiff's uninsured motorists coverage because these payments trigger a reduction in liability that is stated in its Connecticut reparations benefits policy. Alternatively, Amica asserts

---

[8] Because the plaintiff's injuries may well give rise to losses exceeding $100,000, this case is likely to be a coverage dispute between the two insurers. The record does not indicate whether the insurers attempted to resolve their dispute by recourse to alternate methods of dispute resolution.

[9] The parties have not challenged the validity of the court's choice of law decision.

[10] Practice Book § 61-2 provides in relevant part: "When judgment has been rendered on an entire complaint, counterclaim or cross complaint . . . such judgment shall constitute a final judgment."

that Connecticut law permits a reduction to reflect payment of medical benefits on behalf of an insured and that the plaintiff's automobile insurance policy should be construed to authorize such a reduction. Finally, Amica argues that considerations of public policy support its construction of the plaintiff's insurance policy because courts should avoid any reading of a contract that would result in a windfall to one of the contracting parties.[11] We are not persuaded.

## I

We start with Amica's argument for a reduction of coverage based on the terms of the Connecticut reparations benefits policy that was part of the plaintiff's insurance package. In Amica's view, as a matter of contract law, the plaintiff's uninsured motorists coverage is reduced by the $50,000 it paid in New York reparations benefits because of a clause in the Connecticut reparations benefits policy.

The clause states: "Any amount payable for economic loss under Uninsured/Underinsured Motorist Coverage will be reduced by any basic reparations benefits: A. Paid; or B. Payable; to an insured under this policy."[12] Elsewhere, "this policy" defines reparations benefits as payments of no more than $5000 for medical expenses, funeral expenses, work loss and survivor's loss of income arising out of an automobile accident.

The enforceability of this clause to accomplish Amica's claim for reduction in the plaintiff's uninsured motorists coverage depends on the answer to three questions. First, does the clause, on its face, satisfy the requirement that reductions from uninsured motorists

---

[11] To facilitate our analysis, we have reordered the sequence of the arguments advanced by Amica.

[12] Except for its invocation of this provision, Amica has not claimed that the plaintiff's damages are limited by the $5000 ceiling contained in the reparations benefits policy.

coverage must be express and unambiguous? Second, is the clause still enforceable after the repeal of Connecticut's no fault automobile insurance law? Three, does the clause supersede other provisions in the plaintiff's insurance package with respect to uninsured motorists coverage? In our view, all three questions must be answered in the negative.

## A

The trial court held that Amica could not prevail because of patent ambiguities in the language of the provision in the reparations benefits policy on which Amica relies. We agree.

To enforce the contract provision permitting a reduction for payment of reparations benefits, Amica must establish that a Connecticut reparations benefit policy with a stated maximum payout of $5000 expressly and unambiguously encompasses the $50,000 in benefits that it paid under New York law. On its face, this argument is a stretch. Amica has never claimed a $5000 offset. We are perplexed about the basis on which Amica can substitute a $50,000 offset for an unclaimed $5000 offset. Even if the rule of strict construction did not apply, Amica's argument would be implausible. Except for the use of the phrase "reparations benefits" in the policy and in the New York statutes, the policy is simply not a good fit for a reduction in benefits because of New York's reparations requirements.

In addition, the trial court noted a number of ambiguities in the text of the reparations benefits reduction. The court observed that the policy did not define "economic loss," "noneconomic loss" or the relationship between them. It did not spell out the relationship between reparations payments and noneconomic losses. We agree with the court that the Amica Connecticut reparations policy did not provide an express and

unambiguous vehicle for recoupment of New York reparations payment.

### B

The trial court also discussed the relationship between the terms of the reparations benefits policy and the present state of Connecticut automobile insurance law. It held that our legislature's repeal of our no fault automobile insurance laws; see generally Public Acts 1993, No. 93-297; made reductions for benefits based on reparations payments unenforceable. Amica acknowledges that a regulation that once permitted uninsured motorists coverage to be reduced by reparations payments has been repealed.

Amica suggests, however, that the reparations benefits policy is still valid because our law has substituted uninsured motorists coverage for no fault insurance. We are not persuaded that our law equates these coverages. The negligence of an insured plays no role in no fault insurance coverage, but it does play a role in uninsured motorists coverage.

### C

In addition to the reasons advanced by the trial court for finding the reparations benefits clause to be inapplicable, the parties' briefs raise yet another reason why Amica's contractual argument is not persuasive. This reason arises out of the lack of an express structural linkage between the reparations policy and the personal auto policy that provided the plaintiff with uninsured motorists coverage in the first place.

The insurance package that the plaintiff bought from Amica consisted of a number of insurance policies. Each was listed separately on the declaration sheets, which also identified the insured and the insured automobiles. The package contained a Personal Auto Policy, PP 00 01 06 94, as amended by PP 04 91 03 95, and a

Reparations Benefits Coverage—Connecticut policy, PP 05 72 09 94.[13] Each of these policies has its own number and its own pagination.

The personal auto policy is the only policy that described "Uninsured Motorist Coverage." In other substantive parts, the policy described "Liability Coverage," "Medical Payments Coverage," and "Coverage for Damage to Your Auto." Each part had its own "Insuring Agreement," its own definition of who qualified as an "insured" and its own provisions for limitations of coverage. The auto policy also included a number of internal cross references to avoid duplication of coverages. The auto policy did not refer to any other policies that might affect the described coverages.

Similarly, the reparations benefits policy did not refer to any of the provisions in the personal auto policy as the source of the uninsured motorists benefits for which the reparations policy permitted a reduction. In that policy, uninsured motorists coverage was simply left undefined.

As a theoretical matter, it is impossible to reconcile this lack of linkage with the policy that limitations of liability must be express and unambiguous to be enforceable. As a practical matter, the lack of linkage imposes unacceptable burdens on purchasers of automobile insurance.

Although we know that insurance buyers rarely read all the terms of the insurance policies that they purchase, we hold them to have constructive knowledge of the terms of the policy as they reasonably could have been understood. Even an extraordinarily conscientious reader of Amica's personal auto policy would not, however, have had reason to expect that the uninsured

---

[13] The plaintiff also bought coverage for towing and labor costs, safe driver insurance and safety glass.

motorists coverage described in the personal auto policy would be subject to limitations not stated anywhere in that policy.

The personal auto policy gave every external appearance of being an integrated document containing all the relevant terms. As part of the description of uninsured motorists coverage, the text of the auto policy contained a section entitled "Limit of Liability." It provided: "The limit of liability shall be reduced by all sums:

"1. Paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible. This includes all sums paid under Part A [liability insurance]; and

"2. Paid or payable because of the bodily injury under any of the following or similar law:

" 'a. Workers' compensation law'; or

" 'b. Disability benefits law.' "

Correlatively, the text also stated: "We will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any of the following or similar law:

" '1. Workers' compensation law'; or

" '2. Disability benefits law.' "

Finally, the text expressly disallowed duplication of payment "for the same elements of loss under this coverage and Part A. or Part B. of *this* policy." (Emphasis added.)

In our view, these provisions do not give an insured an unambiguous express warning, or indeed any warning at all, of additional coverage limitations in another insurance policy. We recognize that the plaintiff bought the personal auto policy and the reparations policy together, within one overall automobile insurance pol-

icy. There may well be circumstances in which such simultaneity would put an insurance purchaser on notice of everything contained in the entire package. That principle is not applicable, however, if, as in this case, one policy contains extensive provisions describing both coverage and limitations on coverage. At the very least, the insurance package did not provide unambiguously for the linkage between the policies on which Amica's argument rests.

We conclude, therefore, that, under the circumstances of this case, Amica did not contract for the right to engraft the provisions of the reparations benefits policy onto the provisions of the personal auto policy. Indeed, it would be paradoxical to conclude that the plaintiff's purchase of an additional insurance policy diminished the enforceability of his primary insurance coverage.

The trial court properly rejected Amica's argument that the reparations benefits policy authorized it to reduce the plaintiff's uninsured motorists coverage by $50,000, the amount of the New York reparations payments. The text on which Amica relies is far too ambiguous to sustain Amica's claim. It follows that, as a matter of contract law, the plaintiff is entitled to $100,000 in uninsured motorists coverage.

II

The second argument presented by Amica's appeal rests on the applicability of an insurance regulation that permits uninsured motorists insurance to include a provision deducting the payment of medical benefits from uninsured motorists coverage. Section 38a-334-6 (d) (2) of the Regulations of Connecticut States Agencies provides: "The [uninsured motorists] policy may also provide that any direct indemnity for medical expense paid or payable under the policy will reduce the damages which the insured may recover under this

coverage." The trial court held the regulation to be inapplicable. We agree.

Connecticut statutes make uninsured motorists coverage mandatory for private passenger automobile insurance; General Statutes § 38a-334 et seq.; and confer broad authority on the insurance commissioner to adopt regulations with respect to the minimum provisions that such policies must contain. General Statutes § 38a-334 (a); *Dugas* v. *Lumbermens Mutual Casualty Co.*, 217 Conn. 631, 643, 587 A.2d 415 (1991); *Roy* v. *Centennial Ins. Co.*, 171 Conn. 463, 473, 370 A.2d 1011 (1976); *Frager* v. *Pennsylvania General Ins. Co.*, 155 Conn. 270, 279, 231 A.2d 531 (1967); J. Berk & M. Jainchill, Connecticut Law of Uninsured and Underinsured Motorist Coverage (2d Ed. 1999) § 3.2, pp. 181–82. Insurers may, however, include "broader coverage under a policy of automobile liability insurance than that required by such regulations." General Statutes § 38a-334 (b); see also *Chmielewski* v. *Aetna Casualty & Surety Co.*, 218 Conn. 646, 673–74, 591 A.2d 101 (1991).

The trial court held that Amica's personal auto policy did *not* provide that "any direct indemnity for medical expense paid or payable under the policy will reduce the damages which the insured recovered under this coverage." "If an insurer wishes to reduce its payment obligations as set forth in the regulations [and the statutes], it must provide for the reductions by the appropriate policy language. . . . If it fails to do so, the insurer will not obtain the reduction." (Citations omitted.) J. Berk & M. Jainchill, supra, § 6.1, p. 353.

Amica's auto policy stated: "No one will be entitled to receive *duplicate payments* for the same elements of loss under this coverage and part A [liability coverage] or part B [medical expenses] of this policy." (Emphasis added.) Amica argues that "receive *duplicate payments* for the same elements of loss" is the

functional equivalent of the regulatory phrase *"reduce the damages."* The trial court found this argument unpersuasive and so do we.

The auto policy nowhere defines the phrase "same element of loss." It seems entirely plausible to assume that losses attributable to costs for medical services are not the same as losses attributable to lost wages or to pain and suffering. Indeed, costs for some medical services may not cover the cost of other medical services.

Although the regulation and the auto policy both refer to medical costs, the trial court properly concluded that that is not enough for Amica to avail itself of the protection offered by the regulation. The court aptly cited *Chmielewski*, which held that "simply because a given fact pattern falls within both the language of the statutory exclusion and a particular policy exclusion, no matter how phrased, both exclusions will apply without regard to whether the policy exclusion was designed to take advantage of the statutory exclusion or whether the two are substantially congruent." *Chmielewski* v. *Aetna Casualty & Surety Co.*, supra, 218 Conn. 673–74.

We conclude, therefore, that our statutory law did not authorize Amica to reduce its uninsured motorists coverage by the amount of the medical payments it made on behalf of the plaintiff under New York law. The regulation on which the plaintiff relies is stated in permissive terms. Amica's policy did not include the provision reducing liability that the regulation would have permitted the policy to include.

III

Amica's third and final argument is that the judgment of the trial court should be set aside because it violates public policy. It maintains that it is unfair to require payment of New York reparations benefits on top of

Connecticut contractual benefits because such a payment affords the plaintiff $50,000 more coverage than he paid for. In Amica's view, if the judgment is affirmed, the plaintiff obtains a windfall.

It is important to observe that this is not an argument about the possibility of a double recovery. All that the trial court's judgment means is that, if the plaintiff can prove economic and noneconomic damages of $100,000 without reduction by payments from collateral sources, the plaintiff will be made whole to that extent.

We recognize that our holding means that Amica may shoulder more of the plaintiff's uninsured motorists losses than it may have contemplated. That result does not violate public policy when it was both foreseeable and avoidable. Because Amica was authorized to write insurance policies in New York, its loss was foreseeable.[14] Because these payments consisted of the payment of medical expenses, Amica could have provided for a reduction of insurance coverage for these payments in accordance with the applicable Connecticut regulation. Its loss therefore was avoidable.

The judgment is affirmed.

In this opinion the other judges concurred.