STEPHEN PIERSA *v.* PHOENIX INSURANCE
COMPANY ET AL.
(SC 17206)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

---

Argued January 3—officially released May 10, 2005

*Jon Berk*, for the appellant (plaintiff).

*William J. Melley III*, for the appellee (defendant city of Hartford).

*Opinion*

BORDEN, J. The sole issue in this certified appeal is whether a self-insured municipal employer may reduce the limits of its uninsured motorist coverage by the amount of workers' compensation benefits paid, without having created a writing effectuating such a reduction. The Appellate Court concluded that it could do so. *Piersa* v. *Phoenix Ins. Co.*, 82 Conn. App. 752, 753, 848 A.2d 485 (2004). We disagree with that conclusion and, accordingly, we reverse the judgment of the Appellate Court.[1]

The plaintiff, Stephen Piersa, brought this action against the defendant city of Hartford[2] for uninsured motorist benefits. The defendant moved for summary judgment, which the trial court granted. The court then rendered judgment for the defendant. The plaintiff appealed to the Appellate Court, which affirmed the trial court's judgment. This certified appeal followed.

The facts and procedural history are undisputed, as stated by the Appellate Court. "On January 15, 1997, the plaintiff was employed by the defendant as a police officer. On that date, while responding to a call for assistance, the plaintiff sustained personal injuries when an uninsured motor vehicle collided with his police cruiser. As a result of the injuries he sustained, the plaintiff incurred medical expenses and lost time

[1] We granted the plaintiff's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that a self-insured municipal employer may reduce the limits of its uninsured motorist coverage by the amount of compensation benefits paid without reducing it to writing?" *Piersa* v. *Phoenix Ins. Co.*, 269 Conn. 916, 852 A.2d 744 (2004).

[2] The plaintiff's own insurance carrier, Phoenix Insurance Company, was also a defendant in the trial court. Only the plaintiff's claim against the city of Hartford, however, is involved in this appeal. Therefore, we refer herein to the city of Hartford as the defendant.

from his employment. The defendant paid him $42,261.69 in compensation benefits due to his injuries and financial loss. At the time of the accident, the defendant was a self-insured municipality with uninsured motorist coverage limits of $20,000 per person and $40,000 per occurrence.

"The plaintiff commenced this action, seeking uninsured motorist benefits from his own insurance carrier, Phoenix Insurance Company, and the defendant. Only his claim against the defendant is at issue in this appeal. In his amended complaint, the plaintiff alleged the facts concerning his employment and the subject collision. He also alleged that the police cruiser was a self-insured motor vehicle and that the defendant had breached its statutory duty to provide him with uninsured motorist benefits. In response, the defendant denied that it was in breach and alleged four special defenses, including one that '[t]he insurance coverage on the police vehicle is offset by [w]orkers' [c]ompensation benefits received by [the] plaintiff.' After the plaintiff filed a single general denial of the defendant's several special defenses, the defendant filed a motion for summary judgment." Id., 753–54.

It is also undisputed that the only writing created by the defendant regarding the limits of its self-insured motorist coverage was its letter to the state insurance department, dated August 21, 1996, stating in relevant part as follows: "The City of Hartford will continue to be self insured for Automobile Liability, up to $500,000 per occurrence. The required Uninsured and Underinsured Motorist coverages will be self insured with limits of 20/40. . . ." Thus, this writing did not specifically invoke any reductions in limits on the uninsured motorist coverage permitted by statute and regulation, such as the one involved in this case, namely, the reduction for workers' compensation benefits paid. The Appellate Court concluded that "the defendant was not required

to create a writing to reduce its uninsured motorist coverage by the amount of the compensation benefits that were paid to the plaintiff." *Piersa* v. *Phoenix Ins. Co.*, supra, 82 Conn. App. 768. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id. The plaintiff claims that the Appellate Court improperly so concluded. We agree with the plaintiff.

We begin with the common ground between the parties and certain undisputed legal propositions. Because the defendant was the owner of the police cruiser in question, a private passenger motor vehicle, it was obligated to provide insurance with respect to that vehicle in accordance with the applicable statutes: General Statutes § 38a-363 (d) (definition of " '[o]wner' ") and (e) (definition of " '[p]rivate passenger motor vehicle' "); and General Statutes § 38a-371 (a) (requirement that owner of private passenger motor vehicle provide security in accordance with General Statutes §§ 38a-334 through 38a-343). That obligation required the defendant, as a self-insured municipality, "to provide uninsured motorist coverage on its vehicles" pursuant to General Statutes § 38a-336. *Conzo* v. *Aetna Ins. Co.*, 243 Conn. 677, 683 n.9, 705 A.2d 1020 (1998). Although that obligation may be discharged by virtue of an insurance policy or through self-insurance; General Statutes § 38a-371 (b) and (c); the funding mechanism for meeting that requirement is irrelevant to the defendant's obligation to comply with its obligation, because "self-insurance is the functional equivalent of commercial insurance." *Hertz Corp.* v. *Federal Ins. Co.*, 245 Conn. 374, 378 n.4, 713 A.2d 820 (1998); see also General Statutes § 38a-363 (b) (terms " '[i]nsurer' " and " 'insurance company' " include self-insurer). There is no bar on an insurer, and therefore a self-insurer, from providing broader coverage than the minimum required by law. General Statutes § 38a-334 (b); *Willoughby* v. *New Haven*, 254 Conn. 404, 437 n.27, 757 A.2d 1083 (2000).

Moreover, the defendant explicitly agrees with the plaintiff that "[t]he rules, exclusions and reductions that may be applicable to uninsured motorist protection are applicable whether [the] uninsured motorist protection is provided by commercial insurance or self-insurance." Those rules, exclusions and reductions are governed, not specifically by statute, but by the regulations of the insurance commissioner (commissioner) promulgated pursuant to § 38a-334 (a), which requires the commissioner to adopt such regulations "with respect to minimum provisions to be included in automobile liability insurance policies," and which provides that such regulations "shall relate to the insuring agreements, exclusions, conditions and other terms applicable to . . . the uninsured motorists coverages under such policies . . . ."[3] The regulation of the commissioner that is applicable to this case and the meaning of which is at issue

---

[3] General Statutes § 38a-334 provides: "(a) The Insurance Commissioner shall adopt regulations with respect to minimum provisions to be included in automobile liability insurance policies issued after the effective date of such regulations and covering private passenger motor vehicles, as defined in subsection (e) of section 38a-363, motor vehicles with a commercial registration, as defined in section 14-1, motorcycles, as defined in section 14-1, motor vehicles used to transport passengers for hire, motor vehicles in livery service, as defined in section 13b-101, and vanpool vehicles, as defined in section 14-1, registered or principally garaged in this state. Such regulations shall relate to the insuring agreements, exclusions, conditions and other terms applicable to the bodily injury liability, property damage liability, medical payments and uninsured motorists coverages under such policies, shall make mandatory the inclusion of bodily injury liability, property damage liability and uninsured motorists coverages and shall include a provision that the insurer shall, upon request of the named insured, issue or arrange for the issuance of a bond which shall not exceed the aggregate limit of bodily injury coverage for the purpose of obtaining release of an attachment.

"(b) The commissioner, before adopting such regulations or any subsequent modifications or amendments thereof, shall consult with insurers licensed to write automobile liability insurance in this state and other interested parties. Nothing contained in such regulations or in sections 38a-334 to 38a-336a, inclusive, 38a-338 and 38a-340 shall prohibit any insurer from affording broader coverage under a policy of automobile liability insurance than that required by such regulations."

is § 38a-334-6 of the Regulations of Connecticut State Agencies,[4] entitled "Minimum provisions for protection

[4] Regs., Conn. State Agencies § 38a-334-6 provides: "(a) Coverage. The insurer shall undertake to pay on behalf of the insured all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle because of bodily injury sustained by the insured caused by an accident involving the uninsured or underinsured motor vehicle. This coverage shall insure the occupants of every motor vehicle to which the bodily injury liability coverage applies. 'Uninsured motor vehicle' includes a motor vehicle insured against liability by an insurer that is or becomes insolvent.

"(b) Arbitration. The insurance may provide but not require that the issues of liability as between the insured and the uninsured or underinsured motorist, and the amount of damages, be arbitrated. The insurer may provide against being bound by any judgment against the uninsured or underinsured motorist.

"(c) Exclusions. The insurer's obligations to pay may be made inapplicable:

"(1) To any claim which has been settled with the uninsured motorist without the consent of the insurer;

"(2) if the uninsured or underinsured motor vehicle is owned by

"(A) the named insured or any relative who is a resident of the same household or is furnished for the regular use of any of the foregoing,

"(B) a self insurer under any motor vehicle law, or

"(C) any government or agency thereof;

"(3) to pay or reimburse for workers' compensation or disability benefits.

"(d) Limits of liability.

"(1) The limit of the insurer's liability may not be less than the applicable limits for bodily injury liability specified in subsection (a) of section 14-112 of the general statutes, except that the policy may provide for the reduction of limits to the extent that damages have been

"(A) paid by or on behalf of any person responsible for the injury,

"(B) paid or are payable under any workers' compensation law, or

"(C) paid under the policy in settlement of a liability claim.

"(2) The policy may also provide that any direct indemnity for medical expense paid or payable under the policy will reduce the damages which the insured may recover under this coverage.

"(3) Any payment under these coverages shall reduce the company's obligation under the bodily injury liability coverage to the extent of the payment.

"(4) This subsection shall not apply to underinsured motorist conversion coverage except that no payment under a policy providing underinsured motorist conversion coverage shall duplicate payment from any other source.

"(e) Recovery over. With respect to uninsured motorist coverage, the insurer may require the insured to hold in trust all rights against third parties or to exercise such rights after the insurer has paid any claim, provided that the insurer shall not acquire by assignment, prior to settlement or

against uninsured or underinsured motorists," and more specifically, subsection (d) (1) (B) thereof, which provides as follows: "Limits of liability. (1) The limit of the insurer's liability may not be less than the applicable limits for bodily injury liability specified in subsection (a) of section 14-112 of the general statutes, except that the policy may provide for the reduction of limits to the extent that damages have been . . . (B) paid or are payable under any workers' compensation law . . . ." See footnote 4 of this opinion.

There is no dispute that the minimum applicable limits specified in General Statutes § 14-112 are $20,000 per person and $40,000 per accident, and that the defendant's letter to the commissioner specified those minimum amounts. Thus, the defendant, in its notice of self-insurance to the commissioner, specifically stated that it was opting for the minimum coverage. The letter was silent, however, regarding whether that minimum coverage would be further reduced by the reductions in limits specifically permitted by the regulation, including the reduction in limits at issue in the present case.

Consequently, the dispute centers around the meaning and effect of the following language of § 38a-334-6 (d) (1) (B) of the Regulations of Connecticut State Agencies: "except that the *policy* may provide for the reduction of limits" to the extent of workers' compensation payments. (Emphasis added.) The dispute arises because the word "policy" is specifically defined by statute in such a way that it does not comfortably fit within a scheme of self-insurance.

General Statutes § 38a-1 (15) provides as follows: " 'Policy' means any document, including attached endorsements and riders, purporting to be an enforceable contract, which memorializes in writing some or all

judgment, its insured's right of action to recover for bodily injury from any third party."

of the terms of an insurance contract." This definition applies to this case, and to § 38a-334-6 of the regulations, because the opening clause of § 38a-1 provides: "Terms used in this title, unless it appears from the context to the contrary, shall have a scope and meaning as set forth in this section." This definition invokes the traditionally understood insurance policy, with the characteristics of an enforceable written contract between insurer and insured, memorializing the terms of that contract. That definition does not fit comfortably within a self-insurance context because in such a context the insurer and insured are one and the same, and there is no enforceable contract between them.

The question presented by this case, therefore, becomes: how should we interpret the language of § 38a-334-6 (d) (1) of the Regulations of Connecticut State Agencies, "except that the *policy* may provide for the reduction of limits," when there is no such policy within the statutory definition because the insured has chosen to be self-insured? (Emphasis added.) The parties differ on how to answer this conundrum. The plaintiff contends that the self-insured defendant must create some written document specifying, either in specific terms or by reference to the regulation, the reduction of limits that it wishes to invoke. The defendant contends that there is no statutory obligation to do so and that, by electing to be self-insured and notifying the commissioner of that election, it necessarily and as a matter of law provided for all reduction of limits that are permitted by the regulation.

We agree with the plaintiff. We conclude that the language of the regulation must be interpreted so as to require a municipal self-insurer that wishes to impose permitted limits on its obligations as such to do so by a written document that appropriately provides for reduction of limits. We do so for several reasons.

The first reason stems from two closely related notions regarding the relationship between commercial insurers and self-insurers. One is that, by electing to become a self-insurer for its uninsured motorist coverage, pursuant to § 38a-371 (c), the defendant became the functional equivalent of both an insurer and a named insured under § 38a-336 (f). *Hertz Corp.* v. *Federal Ins. Co.*, supra, 245 Conn. 378 n.4; *Conzo* v. *Aetna Ins. Co.*, supra, 243 Conn. 682–83. It follows from this dual role of insurer and insured that the defendant assumed the obligations of an insurer and the rights of an insured. One of its obligations as an insurer is that it "provide 'assurance for payment of all obligations imposed by [§ 38a-371 (c)] substantially equivalent to those afforded by a policy of insurance that would comply with [that] section.' " *Conzo* v. *Aetna Ins. Co.*, supra, 682–83. The second notion is that the "legislature intended to create a uniform scheme of uninsured motorist insurance coverage applicable to self-insurers as well as commercial insurance carriers . . . and . . . that self-insurers have the same obligation as commercial insurers with respect to uninsured motorist laws . . . ." (Citation omitted.) Id., 686. It would be consistent with the defendant's obligations as an insurer under § 38a-371 (c) and with that uniform legislative scheme to require the defendant to create a written document specifying its selected reductions in limits, because a commercial insurer must specify those reductions in limits in its written insurance policy in order to take advantage of them. Similarly, it would be inconsistent with those obligations and that scheme to permit the defendant to take advantage of all of those limits by remaining silent with respect to them, because a commercial insurer would not be able to do so in that fashion.

The second reason is closely related to the first. We have consistently held that, with respect to a commer-

cial insurer, "[w]hen an insurer seeks to limit its liability for uninsured or underinsured motorist coverage based on the regulation issued pursuant to [§ 38a-336],[5] it may do so only to the extent that the regulation expressly authorizes." (Internal quotation marks omitted.) *Chmielewski* v. *Aetna Casualty & Surety Co.*, 218 Conn. 646, 674, 591 A.2d 101 (1991). "In order for a policy exclusion to be expressly authorized by [a] statute [or regulation], there must be substantial congruence between the statutory [or regulatory] provision and the policy provision. . . . *Lowrey* v. *Valley Forge Ins. Co.*, 224 Conn. 152, 156, 617 A.2d 454 (1992)." *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 176, 713 A.2d 1269 (1998); see also *Chmielewski* v. *Aetna Casualty & Surety Co.*, supra, 674. Indeed, in *Chmielewski*, we refused to recognize such a substantial congruence because, although there were substantial similarities between the policy language and the regulation, there were also substantial dissimilarities. *Chmielewski* v. *Aetna Casualty & Surety Co.*, supra, 675.

It would be anomalous to require a commercial insurer to use policy language substantially congruent to the limits specified in the regulation in order for it to take advantage of those limits, but to permit a self-insurer to take advantage of those limits by using no language at all—to do so by silence, as the defendant urges. To do so would not be to create a uniform scheme governing commercial and self-insurers; it would, instead, be to create a scheme that gave self-insurers vastly more leeway to reduce their limits than their commercial insurer counterparts. Put another way, under such a scheme, self-insurers would not be the functional equivalent of commercial insurers; they

[5] Section 38a-336 is the statutory progeny of General Statutes § 38-175c, which is quoted in part in *Chmielewski* v. *Aetna Casualty & Surety Co.*, 218 Conn. 646, 673, 591 A.2d 101 (1991).

would, instead, be the functional superiors of commercial insurers.

Furthermore, the defendant conceded at oral argument before this court that, under its theory of interpretation of § 38a-334-6 of the regulations, by merely notifying the commissioner of its election to be self-insured, it automatically and as a matter of law must be deemed to have selected both the minimum coverage and all permitted reductions in limits. Thus, the defendant maintains that, although in its letter to the commissioner the defendant specifically selected the minimum coverage of $20,000 per person and $40,000 per accident, it was not necessary for it to specify those minimum limits in order to select the minimum coverage; by simply notifying the commissioner that it was electing to be self-insured, its coverage automatically would be the minimum along with all permitted reductions in limits. We are not persuaded that this is so. Given that a self-insurer may elect to maintain coverage that is more than the minimum required by statute, we do not see why its notice to the commissioner of self-insurance necessarily means that it is selecting the minimum coverage.[6] Although the minimum coverage would be less expensive to a self-insured employer, such as the defendant in the present case, it certainly would be within the realm of reason for such an employer nonetheless to elect more than the minimum coverage so as to provide greater protection to its employees who are injured by uninsured motorists. Those who elect to be covered by commercial insurance often elect greater coverage than the minimum; we see no reason for the law to attribute to a self-insurer a presumption that its silence necessarily means an election of only the minimum coverage.

---

[6] We discuss later in this opinion why we disagree with the defendant's contention that the last sentence of § 38a-371 (c) supports its position in this regard.

We emphasize that there is no particular form that a self-insured entity must use in order to take advantage of the permitted reductions in limits. The required written document may be part of its written notice to the commissioner of its election to be self-insured, pursuant to § 38a-371 (c), as the defendant in the present case did with respect to its election of the minimum coverage of $20,000 per person and $40,000 per accident. Or, as our discussion of § 38a-371 (c) in this opinion indicates, it may be as part of a written document that the self-insured entity maintains in its files. Nor is it necessary for the document to repeat verbatim the language of the regulation that the defendant intends to adopt as limits on its coverage. As the plaintiff suggested at oral argument before this court, the defendant could adopt those limits by appropriate language indicating incorporation by reference. The purpose of the document is to require the self-insured entity to fulfill its obligation as insurer by providing a kind of rough equivalence to the obligation of a commercial insurer to limit its coverage by appropriate language in its policy of insurance. Any document that reasonably fulfills that purpose will suffice.

The defendant contends, nonetheless, that it was not required to create such a written document in order to avail itself of the reductions in limits permitted by the regulation. The defendant offers four reasons for this contention: (1) the word "policy" in the regulation does not have its statutory meaning; (2) pursuant to § 38a-371 (c), the only obligation of a municipal self-insurer is to file a notice of self-insurance with the commissioner; (3) case law has not required such a document from municipal employers; and (4) uninsured motorist coverage requirements are construed from the perspective of the municipal self-insurer, rather than from the perspective of the claimant. We disagree with each contention.

The defendant first argues that, although the word "policy" in § 38a-334-6 (d) (1) of the regulations ordinarily means a written contract of insurance between a commercial insurer and an insured; see General Statutes § 38a-1 (15); that definition only applies "unless it appears from the context to the contrary . . . ." General Statutes § 38a-1. Thus, the defendant argues that, in the context of self-insurance, the usual definition does not apply and, instead, the word "policy" has the broader meaning, as used in other contexts, of "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions."[7] (Internal quotation marks omitted.) Giving the word that meaning, however, would be to give it a meaning entirely different from its statutory definition. It is obvious that, when the commissioner promulgated the regulation, she did not contemplate its use in the self-insurance context. It is up to the court, therefore, to fill that gap by interpreting it, recognizing that its statutory definition does not fit strictly within that context. Given a choice between interpreting the word in such a way as to be consistent with the statutory definition and interpreting it in such a way as to be completely different from that definition, we prefer to follow the former course of interpretation.

The defendant also argues that, under § 38a-371 (c),[8] a municipal self-insurer, unlike other self-insurers, need

---

[7] Thus, in the defendant's view, the word "policy" in the regulation, when applied to a self-insurer, has a meaning similar to its use in a context such as, "The administration's *policy* regarding taxes is to reduce them whenever feasible." (Emphasis added.)

[8] General Statutes § 38a-371 (c) provides: "Subject to approval of the Insurance Commissioner the security required by this section, may be provided by self-insurance by filing with the commissioner in satisfactory form: (1) A continuing undertaking by the owner or other appropriate person to perform all obligations imposed by this section; (2) evidence that appropriate provision exists for the prompt and efficient administration of all claims, benefits, and obligations provided by this section; and (3) evidence that reliable financial arrangements, deposits or commitments exist providing

only file with the commissioner "a notice that it is a self-insurer." General Statutes § 38a-371 (c). From this, the defendant contends that "the legislature presumes [that] a municipality has the financial solvency to meet its obligations; it presumes that the municipality itself is the only entity that need have 'evidence' of its terms and obligations; and/or it evidences the legislature's attempt to lessen the paperwork that usually evidences all of the provisions of insurance." We disagree that this single sentence of § 38a-371 (c) has the meaning that the defendant attributes to it, namely, that by filing such a notice with the commissioner a municipal self-insurer necessarily and as a matter of law invokes the minimum coverage permitted by law and all of the permitted further limits on that coverage.

Section 38a-371 (a) (1)[9] provides, in general terms, that an owner of a private passenger motor vehicle must maintain the "security in accordance with sections 38a-334 to 38a-343, inclusive." This includes the uninsured motorist coverage required by § 38a-336.

Subsection (c) of § 38a-371; see footnote 8 of this opinion; addresses the issue of self-insurance. It provides that, subject to the approval of the commissioner, the security "may be provided by self-insurance" by the owner's filing with the commissioner documents

---

assurance for payment of all obligations imposed by this section substantially equivalent to those afforded by a policy of insurance that would comply with this section. A person who provides security under this subsection is a self-insurer. A municipality may provide the security required under this section by filing with the commissioner a notice that it is a self-insurer."

[9] General Statutes § 38a-371 (a) provides: "(1) The owner of a private passenger motor vehicle required to be registered in this state shall provide and continuously maintain throughout the registration period security in accordance with sections 38a-334 to 38a-343, inclusive. (2) The owner of a private passenger motor vehicle not required to be registered in this state shall maintain security in accordance with this section, in effect continuously throughout the period of its operation, maintenance or use as a motor vehicle within this state with respect to accidents occurring in this state."

indicating three essential things: (1) a "continuing undertaking by the owner" to perform all of the obligations imposed by § 38a-371; (2) evidence of the prompt and efficient administration of claims, benefits and obligations provided by the section; and (3) evidence of sufficient financial responsibility "substantially equivalent to those afforded by a policy of insurance that would comply with" the section's obligations. General Statutes § 38a-371 (c). The penultimate sentence of subsection (c) of § 38a-371 provides: "A person who provides security under this subsection is a self-insurer. . . ." The last sentence, upon which the defendant relies, provides: "A municipality may provide the security required under this section by filing with the commissioner a notice that it is a self-insurer." General Statutes § 38a-371 (c).

This last sentence was enacted by the legislature as No. 82-145 of the 1982 Public Acts, entitled "An Act Concerning The Exemption Of Municipalities From The Self-Insurance Certificate Filing Requirement." The legislative history of the act indicates that it was intended to relieve self-insuring municipalities from the same filing requirements imposed on other self-insurers, and, correspondingly, to relieve the insurance department from maintaining the same records regarding such municipalities as it does regarding other self-insurers. That same legislative history, however, also indicates that the legislature viewed this as a measure designed to simplify filing requirements, but also contemplated that the municipality nonetheless would be the repository of at least some other necessary information.[10]

---

[10] Senator Frederick Knous, who reported the bill out to the Senate, explained it as follows: "[B]asically what we are trying to do is eliminate the requirement that municipalities which self-insure under the no-fault law file a self-insurance certificate with the Insurance Department. Municipalities are not required to include a bond with their filings *and any information contained in the filing can be obtained from the municipality if the need arises*, and there would be, as a result of this action, a minimal cost savings as far [as] the Department since they would not have to maintain those self-

There is nothing in either the language of the act or its purpose to suggest that it was designed to create a presumption that silence by a municipality in this filing regarding the scope of coverage would mean that the minimum coverage and all permitted reductions in limits were applicable as a matter of law. Put another way, this sentence simply cannot carry the weight that the defendant attributes to it.

The defendant next argues that case law has not required a written document from municipal self-insurers in order for them to be obligated for only the minimum coverage for uninsured motorist benefits. In this connection, the defendant relies principally on two decisions of the Appellate Court, namely, *Boynton* v. *New Haven*, 63 Conn. App. 815, 779 A.2d 186, cert. denied, 258 Conn. 905, 782 A.2d 136 (2001), and *Serra* v. *West Haven*, 77 Conn. App. 267, 822 A.2d 1018 (2003). We, of course, are not bound by decisions of the Appellate Court. Irrespective of that consideration, however, we disagree that those decisions persuasively support the defendant's interpretation of the regulation at issue.

insurance records for municipalities." (Emphasis added.) 25 S. Proc., Pt. 3, 1982 Sess., p. 609. Senator Knous explained the bill similarly on a later occasion: "[T]he Bill eliminates the requirement that municipalities with self insurance under the no-fault law, file a self insurance certificate with the Insurance Department. The municipalities are not required to include a bond with their filings. *Any information contained in the filing can be obtained from the municipality if the need arises.*" (Emphasis added.) 25 S. Proc., Pt. 6, 1982 Sess., pp. 1838–39.

Similarly, in the House of Representative, Representative Robert G. Jaekle stated: "[T]he intention of the bill was to remove the filing requirements on the [nine] or so municipalities that self-insure. . . . The amendment would delete the new language in the File Copy . . . substituting in lieu of the rather burea[u]cratic filing requirements . . . that these municipalities file a notice with the Insurance Commissioner to the effect that they will be self-insurers. And, thus, I think it's in keeping with the intention of the file which was to remove some burea[u]cratic paperwork from our municipalities and also from our insurance department and substitute a very simplified procedure where a mere letter or notice is filed with the Insurance Commissioner . . . ." 25 H.R. Proc., Pt. 6, 1982 Sess., pp. 1998–99.

In *Boynton*, the plaintiff police officer, who had been injured by an underinsured motorist, sought to recover the unpaid portion of his damages from the defendant city, which was self-insured. The city had given notice of its self-insured status to the commissioner but, as of the date of the plaintiff's injuries, had not put any limits on its coverage in any written document, including its notice to the commissioner. *Boynton* v. *New Haven*, supra, 63 Conn. App. 819–20. The plaintiff argued that: (1) under the principle of parity between liability and underinsured motorist coverage, because the city's liability was unlimited, its underinsured motorist coverage was also unlimited; and (2) the city could not invoke minimum coverage without some kind of written waiver or notice. Id., 826. The Appellate Court disagreed with both arguments. Id.

With respect to the first argument, the court concluded that the principle of parity did not require the city to provide unlimited underinsured motorist coverage because, in the court's view, that proposition was based on (1) General Statutes § 14-129, a linkage that this court specifically had ruled against in *Willoughby* v. *New Haven*, supra, 254 Conn. 434, and (2) the text of § 38a-336 (a) (2), which, although it does require such parity, the court concluded that it did not require unlimited coverage because the exposure of commercial insurers was not unlimited. *Boynton* v. *New Haven*, supra, 63 Conn. App. 826–27. We are not persuaded by this reasoning.

In *Boynton*, the Appellate Court dismissed, in a footnote, a different argument of the plaintiff for parity, based on this court's decision in *Travelers Indemnity Co.* v. *Malec*, 215 Conn. 399, 402, 576 A.2d 485 (1990). *Boynton* v. *New Haven*, supra, 63 Conn. App. 826 n.20. We conclude, however, that the Appellate Court's treatment of that claim of the plaintiff in *Boynton* was misguided.

In *Malec*, this court, in reviewing an underinsured motorist arbitration award, noted that our statutory uninsured and underinsured motorist scheme was designed to require parity between an insured's liability and uninsured motorist coverage. We stated: "Prior to the enactment of [General Statutes] § 38-175c [now § 38a-336]; see Public Acts 1967, No. 510; [uninsured motorist] coverage, although available, was not required. Coverage was limited to the amount requested by the insured. In 1969, § 38-175c was amended to require parity of [uninsured motorist] coverage with the *minimum limits* of liability coverage required by General Statutes § 14-112 (a). See Public Acts 1969, No. 202. In 1983, § 38-175c was again amended now to require parity of [uninsured motorist] coverage with the *amount of liability coverage purchased by the insured* unless the insured specifically requested a lesser amount. See Public Acts 1983, No. 83-461." (Emphasis in original.) *Travelers Indemnity Co.* v. *Malec*, supra, 215 Conn. 402–403. The Appellate Court in *Boynton* rejected this statement as "not helpful because it arose in the context of an arbitration award. In light of the limited scope of judicial review of arbitration awards; *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 185, 530 A.2d 171 (1987); the court's analysis of the legislative history is dictum." *Boynton* v. *New Haven*, supra, 63 Conn. App. 826 n.20. The flaw in this reasoning of the Appellate Court is that the scope of judicial review of legal issues arising in the course of uninsured motorist arbitral awards is not limited, as in the usual case of arbitral awards, but is plenary because the arbitration is considered to be compulsory, rather than voluntary. *Chmielewski* v. *Aetna Casualty & Surety Co.*, supra, 218 Conn. 658–59. Thus, in *Malec*, this court correctly stated the law regarding the relationship of parity between liability and uninsured motorist coverage in the course of de novo review of legal issues,

contrary to the Appellate Court's characterization of that discussion.

In this connection, we acknowledge the conclusion of the Appellate Court in *Boynton* that the city was not required to document in writing its intent to avail itself of the statutory minimum of uninsured motorist coverage, because that "would have required the city, wearing its hat as insured, to file a written request with itself, wearing its hat as insurer," a requirement that the court considered to be "untenable." *Boynton* v. *New Haven*, supra, 63 Conn. App. 828. We disagree, however, that that conclusion controls the present case.

In that passage, the court was referring to the provisions of § 38a-336 (a) (2),[11] and not the provision at issue in the present case, namely, § 38a-334-6 of the Regulations of Connecticut State Agencies. Section 38a-336 (a) (2) provides that, despite the general require-

---

[11] General Statutes § 38a-336 (a) (2) provides: "Notwithstanding any provision of this section to the contrary, each automobile liability insurance policy issued or renewed on and after January 1, 1994, shall provide uninsured and underinsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless any named insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by any named insured. No such written request for a lesser amount shall be effective unless any named insured has signed an informed consent form which shall contain: (A) An explanation of uninsured and underinsured motorist insurance approved by the commissioner; (B) a list of uninsured and underinsured motorist coverage options available from the insurer; and (C) the premium cost for each of the coverage options available from the insurer. Such informed consent form shall contain a heading in twelve-point type and shall state: 'WHEN YOU SIGN THIS FORM, YOU ARE CHOOSING A REDUCED PREMIUM, BUT YOU ARE ALSO CHOOSING NOT TO PURCHASE CERTAIN VALUABLE COVERAGE WHICH PROTECTS YOU AND YOUR FAMILY. IF YOU ARE UNCERTAIN ABOUT HOW THIS DECISION WILL AFFECT YOU, YOU SHOULD GET ADVICE FROM YOUR INSURANCE AGENT OR ANOTHER QUALIFIED ADVISER.' "

ment of parity between liability and uninsured motorist coverage, an insurer could provide less uninsured motorist coverage if "any named insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. . . ." We do not disagree with the Appellate Court that applying that provision literally in the self-insurance context would be counterintuitive, because that provision is a notice provision requiring informed consent by the insured. Section 38a-334-6 of the regulations, however, is not such a notice provision; it is a provision that specifies the basic requirement of how an insurer—self or commercial—may limit its liability. It is neither untenable nor counterintuitive to require a self-insurer to file a written document to accomplish that purpose so as to achieve a rough equivalence to a commercial insurer.

We are also not persuaded by the defendant's reliance on *Serra* v. *West Haven,* supra, 77 Conn. App. 267, because that decision relied principally on *Boynton.* In *Serra,* the plaintiff, again a police officer injured by an underinsured motorist, claimed that the self-insured defendant city had elected more than the minimum required coverage because it had purchased an excess liability policy with a self-insured retention of $50,000. Id., 269–70. The Appellate Court rejected this claim based on its prior decision in *Boynton.* The court stated: "Although the present case is distinguishable because West Haven is not a fully self-insured municipality and, therefore, its liability would not be unlimited, we conclude that this difference is not controlling and the reasoning of *Boynton* applies. The fact that West Haven has a $50,000 self-insured retention policy does not remove the presumption that a self-insured municipality elects the statutory minimum amount of coverage in the absence of a writing to the commissioner stating otherwise." Id., 273.

The defendant's final argument is that uninsured motorist requirements are construed from the perspective of municipal self-insurers rather than from the perspective of the claimant. Therefore, the defendant contends, because the expectations of an injured employee of a municipal or commercial employer that has a fleet policy are different from those of an individual insured and, therefore, do not contemplate stacking of coverage; see, e.g., *Wilson* v. *Security Ins. Co.*, 213 Conn. 532, 569 A.2d 40, cert. denied, 498 U.S. 814, 111 S. Ct. 52, 112 L. Ed. 2d 28 (1990), cert. denied, 502 U.S. 1005, 112 S. Ct. 640, 116 L. Ed. 2d 658 (1991); *Cohen* v. *Aetna Ins. Co.*, 213 Conn. 525, 569 A.2d 541 (1990); see also *Frantz* v. *United States Fleet Leasing, Inc.*, 245 Conn. 727, 714 A.2d 1222 (1998) (requirement of General Statutes [Rev. to 1991] § 38a-336 [a] [2] of written election of reduced uninsured motorist coverage by all insureds does not apply in context of commercial fleet insurance); the same considerations should apply to relieve the defendant in the present case of any obligation to limit its coverage by a written document. We are not persuaded. First, none of those cases involved the regulation at issue in the present case. Second, however sensible those considerations may be in the context of those cases, we are not persuaded that they trump the considerations of the language of the regulation, and the underlying policies of functional equivalence of commercial and self-insurance that we previously have outlined in this opinion.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court, and to remand the case to that court for further proceedings according to law.

In this opinion the other justices concurred.