LOCAL 1339, INTERNATIONAL ASSOCIATION OF
FIREFIGHTERS *v.* CITY OF WATERBURY ET AL.
(SC 17293)
(SC 17294)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued April 19—officially released July 12, 2005

*Linda L. Morkan,* with whom was *Richard F. Vita-relli,* for the appellant in Docket No. SC 17293 (defendant Waterbury financial planning and assistance board).

*Brian Clemow,* with whom was *Sheila Huddleston,* for the appellant in Docket No. SC 17294 (named defendant).

*Robert M. Shields, Jr.*, with whom were *Kimberly A. Knox* and *James Ferguson*, for the appellee in both cases (plaintiff).

*Opinion*

KATZ, J. The dispositive issue in these consolidated appeals is whether the defendant Waterbury financial planning and assistance board (oversight board) exceeded its authority under No. 01-1 of the 2001 Special Acts (S.A. 01-1)[1] and the Municipal Employees Rela-

---

[1] Special Act 01-1 provides in relevant part: "Section 1. It is hereby found and declared that a financial emergency exists with regard to the city of Waterbury, that the continued existence of this financial emergency is detrimental to the general welfare of the city and the state, that the city's continued ability to borrow in the public credit markets and the resolution of this financial emergency is a matter of paramount public interest and that to achieve this resolution it is necessary, appropriate and an essential public purpose to provide in this act for the financing of deficits resulting from the city's operations, the imposition of financial management controls and the creation of the Waterbury Financial Planning and Assistance Board to review the financial affairs of the city of Waterbury, all in order to achieve or maintain access to public credit markets, to fund the city's accumulated deficits and to restore financial stability to the city of Waterbury.

\* \* \*

"Sec. 10. (a) There is hereby created the Waterbury Financial Planning and Assistance Board which shall be in the Office of Policy and Management for administrative purposes only, which board shall be comprised of the following members: The Secretary of the Office of Policy and Management or the secretary's designee, who shall serve as the chairman of the board and shall preside over all meetings of the board; the State Treasurer or the treasurer's designee; the mayor; four members appointed by the Governor, one of whom shall be a resident of the city of Waterbury, one of whom shall be affiliated with a business located in the city, one of whom shall have an expertise in finance and one of whom shall be the chief executive officer of a bargaining unit representing employees of the city who is jointly recommended by a majority of the chief executive officers of such units provided such recommendation shall be made not later than seven days after the effective date of this act. . . .

"Sec. 11. (a) In carrying out the purposes of this act, the board shall have the following powers, duties and functions . . .

"(4) (A) Approve or reject all collective bargaining agreements for a new term, other than modifications, amendments or reopeners to an agreement, to be entered into by the city or any of its agencies or administrative units, including the board of education. If the board rejects a proposed collective

tions Act (MERA), General Statutes § 7-460 et seq., by imposing binding arbitration after it was unable to render an award in an earlier arbitration within the pre-

bargaining agreement, the parties to the agreement will have ten days from the date of the board's rejection to consider the board's concerns. In rejecting an agreement, the board shall indicate the specific provisions of the proposed agreement which caused the rejection, as well as its rationale for the rejection. The board may, at its option, indicate the total cost impact or savings it would find acceptable in a new agreement. After the expiration of such ten-day period, the board shall approve or reject any such agreement. If the parties have been unable to reach an agreement or the board rejects such agreement, the board shall set forth the terms of the agreement, which shall be binding upon the parties. In establishing the terms of the agreement, as well as in making a determination to reject a proposed agreement, the parties shall have an opportunity to make a presentation to the board. The board shall not be limited to consideration and inclusion in the collective bargaining agreement of matters raised or negotiated by the parties;

"(B) Approve or reject all modifications, amendments or reopeners to collective bargaining agreements entered into by the city or any of its agencies or administrative units, including the board of education. If the board rejects a proposed amendment to a collective bargaining agreement, the parties to the agreement will have ten days from the date of the board's rejection to consider the board's concerns. In rejecting an amendment to an agreement, the board shall indicate the specific provisions of the proposed amendment which caused the rejection, as well as its rationale for the rejection. The board may, at its option, indicate the total cost impact or savings it would find acceptable in a new amendment. After the expiration of such ten-day period, the board shall approve or reject any revised amendment. If the parties have been unable to reach a revised amendment or the board rejects such revised amendment, the board shall set forth the terms of the new amendment, which shall be binding upon the parties. In establishing the terms of the new agreement, as well as in making a determination to reject a proposed amendment, the parties shall have an opportunity to make a presentation to the board;

"(5) With respect to labor contracts in or subject to binding arbitration, serve as the binding arbitration panel. The board shall have the power to impose binding arbitration upon the parties any time after the seventy-fifth day following the commencement of negotiations. If, upon the effective date of this act, the parties are in binding arbitration, the board shall immediately replace any established binding arbitration panel. The time limits in the applicable provisions of the general statutes or any public or special acts governing binding arbitration shall be reduced by one-half. The board shall not be limited to consideration and inclusion in the collective bargaining agreement of the last best offers or the matters raised by or negotiated by the parties . . . ."

scribed time period. The defendants, the oversight board and the city of Waterbury (city), appeal from the judgment of the trial court granting the application of the plaintiff, Local 1339, International Association of Firefighters (union), to vacate the arbitration award on the ground that it was not rendered within the prescribed period. The defendants claim that the trial court improperly concluded that, although S.A. 01-1 did not necessarily preclude the oversight board from reimposing binding arbitration when it could not render an award in a prior arbitration due to a deadlocked vote, the oversight board was required to render the award within the time period triggered by the first arbitration. We agree with the defendants and, we accordingly, reverse the judgment of the trial court.

A joint stipulation of facts submitted to the trial court and the record reveal the following facts and procedural history. The legislature created the oversight board, pursuant to S.A. 01-1, to manage the city in its ongoing fiscal crisis. The oversight board is comprised of seven members and exists "until such time as the general fund . . . of the city shall have, for five consecutive fiscal years, maintained a positive unreserved fund balance . . . ." S.A. 01-1, § 14 (a); see also footnote 1 of this opinion. Its authority includes, inter alia, the authority to approve or reject all collective bargaining agreements for a new term and, with respect to labor contracts subject to binding arbitration, to serve as the binding arbitration panel. S.A. 01-1, § 11 (a) (4) (A) and (5).

The union represents certain employees of the Waterbury fire department for purposes of collective bargaining. The union and the city were parties[2] to a collective bargaining agreement covering the period from July 1, 1999, through June 30, 2004. On approxi-

---

[2] The term "parties," as used in this opinion, refers to the city and the union in their capacity as parties to the collective bargaining agreement.

mately November 6, 2003, pursuant to its authority under S.A. 01-1, the oversight board notified the parties that they should reserve dates between May 17, 2004, and May 28, 2004, for arbitration in the event that they could not reach agreement on a new collective bargaining agreement to take effect after June 30, 2004. On May 14, 2004, the oversight board notified the parties that it was imposing binding arbitration and commenced hearings on May 17, 2004. The union elected not to participate in the proceedings and, instead, submitted its last best offer.

On May 19, 2004, pursuant to its own rules of procedure, the oversight board provided the parties with a list of issues in dispute and its own additional issues of concern. The parties jointly requested, and the oversight board approved, an extension of time until June 4, 2004, for the parties to submit their last best offers. On May 28, 2004, the oversight board issued an arbitration statement, approved by a majority of its members, setting forth 174 issues to be resolved by the parties, including its own issues of concern. On June 3, 2004, the parties presented to the board identical last best offers purporting to resolve all of their issues, which the board accepted. Pursuant to MERA, as modified by S.A. 01-1, the board then had until June 15, 2004, to issue an award in the arbitration.[3]

On or about June 13, 2004, George Hajjar, an oversight board member who had not attended the arbitration hearings, notified the board that, for personal reasons, he would not participate in the vote. On June 15, 2004, the board notified the parties that it was deadlocked three to three and, thus, could not obtain the four votes required by S.A. 01-1, § 10 (b), for issuing an award

---

[3] Although the record is not entirely clear on this matter, it appears that the June 15, 2004 deadline was triggered by the parties' joint request for an extension until June 4 to submit their last best offers.

within the prescribed time period. On or about June 25, 2004, Hajjar resigned, and the governor appointed a new board member to replace him.

On June 29, 2004, the oversight board notified the parties that it had reserved certain dates in July, 2004, for commencing a new arbitration proceeding. On July 1, 2004, following the expiration of the parties' collective bargaining agreement, the board again voted to impose binding arbitration. On July 6, 2004, the oversight board held a hearing at which it entered into evidence the record from the prior arbitration proceedings. At the hearing, the union read a statement indicating its decision not to participate in the proceedings and submitted its last best offer. The union also contested the oversight board's authority to conduct the arbitration, claiming that there was no statutory authority for conducting a second binding arbitration. On July 15, 2004, the oversight board continued the hearing, and on July 16, 2004, issued an arbitration statement, approved by a majority of its members, setting forth 175 issues that it needed to resolve. The city submitted its last best offer on July 20, 2004, and its brief in support of that offer on July 23, 2004. On August 4, 2004, the oversight board voted five to two to issue its award and to implement the bargaining agreement in the second arbitration.

Thereafter, the union filed an application in the trial court to vacate the award pursuant to General Statutes § 52-418. The union claimed that the oversight board was required under S.A. 01-1 and MERA to issue the arbitration award by June 15, 2004. The union further claimed that, by failing to do so, the oversight board had exceeded its authority because neither MERA nor S.A. 01-1 authorized the board to reimpose binding arbitration and thereby avoid the time limits prescribed for rendering an award. The trial court first concluded that, because S.A. 01-1 did not provide that only one arbitra-

tion is authorized, the special act was ambiguous as to whether the oversight board had the authority to conduct a second arbitration. The court determined, however, that the board's authority to impose binding arbitration must be read in conjunction with the time limits prescribed for rendering an award. It then concluded that the oversight board had to comply strictly with the time limits and thus was required to submit its decision and award by June 15, 2004. Because the oversight board had failed to do so, the trial court concluded that the board had exceeded its authority, and the court granted the union's application to vacate the award.

The city and the oversight board then each appealed from the judgment of the trial court to the Appellate Court. Thereafter, they filed applications for an expedited appeal to this court on a matter of public interest pursuant to General Statutes § 52-265a, which the Chief Justice granted.

The defendants claim that, in rendering the award, the oversight board acted in accordance with the authority it was granted under S.A. 01-1 because the board's inability to issue a decision within the prescribed time limits due to the unforeseen deadlocked vote rendered the first proceeding a nullity. According to the defendants, the pertinent language in S.A. 01-1 is broad enough to permit it to conduct a second arbitration in order to render an award. The defendants contend that the trial court construed the special act and MERA in a manner that thwarts the legislature's intent to give finality to the collective bargaining process and to confer authority on the oversight board to impose the necessary measures to protect the city in that process.

In response, the union claims that the first arbitration did, in fact, result in a final decision in that the three

to three deadlock constituted a rejection of the parties' last best offers. It further claims that S.A. 01-1 does not authorize the oversight board to conduct a second binding arbitration. The union thus contends that the board lacked authority to take any action after June 15, 2004, when the time limit for rendering an award in the first arbitration expired. Finally, the union contends that precluding further arbitration under such circumstances is consistent with the scheme prescribed by the legislature, which provides other mechanisms for ensuring finality of agreements and board oversight. We agree with the defendants.

I

We begin with a brief overview of the unique legal landscape in which this case arises. In 2001, "as a result of many years of gross fiscal mismanagement, the city was in a state of financial crisis. See S.A. 01-1, § 1. Specifically, the city had underfunded its pensions for years and was paying its pension liabilities out of the city's general fund. In addition, the city had been paying health care benefits, the cost of which were rapidly rising, out of the city's general fund. As a result of these and other liabilities, the city's bond rating had been downgraded. The crisis threatened not only the city, but also the fiscal reputation of the state, which acts essentially as guarantor of certain of the city's obligations.

"To address the crisis, the legislature enacted S.A. 01-1, effective upon its passage on March 9, 2001. . . . In accordance with the special act, the city was required to undertake certain fiscal and management controls. As a further measure, the legislature created the oversight board to ensure that order was restored to the city's finances. S.A. 01-1, §§ 10 and 11. The special act confers broad authority on the oversight board to take the necessary measures to accomplish this goal. S.A.

01-1, § 11." *Poole* v. *Waterbury*, 266 Conn. 68, 75, 831 A.2d 211 (2003). Special Act 01-1 supersedes all other provisions of the General Statutes enacted prior to the effective date of the act "except that, unless expressly provided in this act, nothing in [the] act shall affect the provisions of [MERA] . . . ." S.A. 01-1, § 20.

The extent of the authority conferred on the board is nothing short of extraordinary. Nowhere is that more evident than in the context of collective bargaining agreements for the city's employees. See 44 S. Proc., Pt. 2, 2001 Sess., p. 494, remarks of Senator Stephen R. Somma (noting that "[t]he labor provisions . . . are extraordinary but the times are extraordinary in Water-bury"). For example, under MERA, which applies to municipal employees generally, the state board of medi-ation and arbitration (state board) may impose man-datory binding arbitration. General Statutes § 7-473c (b) (1). Under the binding arbitration of MERA, the parties each submit a proposed collective bargaining agreement. General Statutes § 7-473c (d) (1). After the state board provides a list of the areas of agreement and dispute; General Statutes § 7-473 (d) (2); the parties submit to the board their last best offers on the disputed issues. General Statutes § 7-473c (d) (3). The state board adopts the agreed upon terms and selects one of the parties' last best offers as to each disputed issue. Gen-eral Statutes § 7-473c (d) (6). "The structure of 7-473c, which limits the arbitrators to choosing the 'last best offer' of one party over that of the other, indicates that the primary emphasis of the legislation was to induce settlement of disputes by negotiation under the impetus that the most reasonable proposal would probably gain acceptance by the arbitrators. This narrowing of the scope of arbitrator discretion to a choice between two proposals as formulated by the parties upon an unre-solved issue significantly circumscribes what might oth-erwise be deemed a broad delegation of legislative power." *Carofano* v. *Bridgeport*, 196 Conn. 623, 635,

495 A.2d 1011 (1985). Indeed, under MERA, the parties may withdraw authority completely from the state board even after it imposes binding arbitration by stipulating to an agreement any time before the board renders an award. See *International Brotherhood of Police Officers, Local 564* v. *Jewett City*, 234 Conn. 123, 136–37, 661 A.2d 573 (1995) (concluding that parties could stipulate to presenting their negotiated collective bargaining agreement to arbitration panel for issuance as panel's stipulated award even after compulsory binding arbitration has been imposed under § 7-473c). Thus, under MERA, the parties, either collectively or individually, set the terms of their collective bargaining agreement. See id., 132 (discussing limited discretion conferred on arbitration panel for mandatory binding arbitration authorized by MERA).

By contrast, under S.A. 01-1, the oversight board must approve and may reject any new collective bargaining agreement, as well as modifications or amendments to existing agreements. S.A. 01-1, § 11 (a) (4). Specifically with respect to the city's labor contracts subject to binding arbitration, the oversight board must serve as the arbitration panel. S.A. 01-1, § 11 (a) (5). Most significantly, when acting in that capacity, the special act provides that "[t]he board shall not be limited to consideration and inclusion in the collective bargaining agreement of the last best offers or the matters raised by or negotiated by the parties . . . ." Id.; accord S.A. 01-1, § 11 (a) (4) (A) (conferring same authority on board for approval of any new collective bargaining agreement). Thus, the oversight board may expand the issues subject to arbitration beyond those that the parties wish to negotiate and may reject terms *even when agreed upon by the parties.*[4] See S.A. 01-1, § 11 (a) (4)

---

[4] Indeed, the legislative history reveals that the essentially absolute power granted to the oversight board under S.A. 01-1 to set the terms of labor contracts, even when those terms were not in dispute between the parties, was debated vigorously, but amendments proposed in both the House of Representatives and the Senate to place limits on the board's authority as

(A) and (B) (authorizing oversight board to same extent with respect to approval of collective bargaining agreements for new term generally and with respect to modification of or amendment to existing agreements). In sum, in sharp contrast to the collective bargaining process provided under MERA, the legislature clearly has provided in S.A. 01-1, § 11 (a) (4) (A) that it is the oversight board, not the parties, that ultimately "shall set forth the terms of the agreement . . . ." Accord S.A. § 11 (a) (4) (B) ("the board shall set forth the terms of the new amendment"). With this background in mind, we turn to the case at hand.

## II

The defendants claim that the trial court improperly determined that the oversight board had exceeded its authority under S.A. 01-1 and MERA by imposing arbitration a second time after its deadlocked vote pursuant to the first arbitration precluded issuance of a timely decision and award. Specifically, they contend that the legislature did not envision the circumstances presented here, but its delegation of authority to the oversight board under S.A. 01-1 is broad enough to permit it to reimpose arbitration in this case. They further contend that the trial court's construction leads to a result that is inconsistent with the policies underlying both the special act and MERA.

The union contends in response that S.A. 01-1 does not expressly authorize the oversight board to impose a second binding arbitration and that, in the absence of such express authority, the board exceeded its authority by rendering the award pursuant to the second arbitration. The union also contends that the legislature provided an alternative framework that remedies the circumstances presented and that is consistent with the

to these contracts ultimately were rejected. See 44 H.R. Proc., Pt. 3, 2001 Sess., pp. 742–805; 44 S. Proc., Pt. 2, 2001 Sess., pp. 500–41.

policies underlying S.A. 01-1 and MERA. We agree with the defendants.

We begin by noting that the scope of the oversight board's authority presents an issue of statutory construction, a question of law over which we exercise plenary review. See *Wiseman* v. *Armstrong*, 269 Conn. 802, 809, 850 A.2d 114 (2004). When construing a statute, we first look to its text, as directed by General Statutes § 1-2z, which provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." To determine whether there is an ambiguity, we consider "whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Tarnowsky* v. *Socci*, 271 Conn. 284, 287 n.3, 856 A.2d 408 (2004). When a statute is not plain and unambiguous, we also seek interpretive guidance from, inter alia, the legislative history of the statute and the circumstances surrounding its enactment, as well as the legislative policy it was designed to implement. See *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 742, 865 A.2d 428 (2005).

We turn, therefore, to the pertinent provision of the special act. Section 11 (a) of S.A. 01-1 provides in relevant part: "In carrying out the purposes of this act, the board shall have the following powers, duties and functions . . . (5) With respect to labor contracts in or subject to binding arbitration, serve as the binding arbitration panel. The board shall have the power to impose binding arbitration upon the parties any time after the seventy-fifth day following the commencement of negotiations. . . . The time limits in the applicable provisions of the general statutes or any public or spe-

cial acts governing binding arbitration shall be reduced by one-half. . . ."[5]

It is undisputed that, by virtue of the reduced time limits, the oversight board was required under this provision and MERA to render an award pursuant to the first arbitration by June 15, 2004, which it failed to do as a result of the deadlocked vote. The critical question, therefore, is whether the time limitation from the first arbitration controls once the oversight board has imposed arbitration in the first instance or whether the board has the authority to impose arbitration a second time when it was precluded from rendering a timely award, thereby triggering a new time limit for rendering an award. We agree with the defendants that S.A. 01-1 is ambiguous as to this question.

Special Act 01-1, § 11 (a) neither expressly authorizes the oversight board nor precludes it from imposing a second arbitration under these circumstances. Although this provision refers to "arbitration" in the singular, the legislature has directed that such terms may encompass both singular and plural numbers. See General Statutes § 1-1 (f). Indeed, the term "arbitrations" appears nowhere in the statutes. The fact that the legislature conferred authority on the oversight board to impose binding arbitration "*any* time after the seventy-fifth day following the commencement of negotiations"; (emphasis added) S.A 01-1, § 11 (a) (5); could be read as authorizing the board to impose arbitration on more than one occasion, although we agree with the defendants that, despite this language, it is unlikely that the

---

[5] The legislative history of S.A. 01-1 makes no reference to the time limitations and thus does not indicate the impetus for reducing the time limits by one half. We only can surmise that the legislature intended to accelerate the finality of arbitration awards and thus minimize labor impasses. Thus, we decline to attach any significance to the reduction for purposes of this appeal.

legislature used this phrase in recognition of the problem presented under these precise circumstances.[6]

Nonetheless, we cannot agree with the union's characterization of the board's actions in the present case as having twice imposed "binding arbitration." The board twice *voted* to impose binding arbitration and conducted two arbitration proceedings, but rendered an award that bound the parties pursuant to the second arbitration only. It is difficult to characterize the first arbitration as binding when the parties were not in fact bound as a result of anything that occurred pursuant to that proceeding. Moreover, although we reject the union's characterization of the three to three deadlock as a rejection of the parties' last best offers, a rejection nonetheless would not constitute a binding arbitration award. Thus, we tend to agree with the defendants that,

---

[6] The legislative history of S.A. 01-1 sheds no light on this question. There was no mention during debates on the proposed legislation of either the possibility of a deadlock or multiple arbitration proceedings. The union asserts, however, that the legislative history reflects that the legislature was mindful of the possibility of a deadlocked vote and did not prescribe a remedy within the special act, thus evincing its intent that the oversight board strictly adhere to the time limits. We disagree with the union's reading of the legislative history.

The passage cited by the union reflects that Representative David McCluskey raised a question as to whether there was a mechanism in the special act for replacing the only representative on the oversight board appointed by the unions in the event that the union representative needed to recuse herself due to a conflict of interest because the collective bargaining agreement subject to binding arbitration was one in which her own union had a vested interest. See 44 H. Proc., Pt. 3, 2001 Sess., pp. 820–23. Representative Anne McDonald simply responded that the act had no such mechanism. Id., p. 822. The union contends that this omission suggests that the legislature intended for other procedures provided under the statutory scheme to be utilized in the event of a deadlocked vote, rather than for the oversight board to impose a second arbitration. We disagree that this limited exchange demonstrates that the legislature considered the possibility that the recusal of one board member could result in a deadlocked vote. Indeed, such a result would not be inevitable in such a case, as the oversight board could vote four to two, five to one or six to zero to adopt a decision.

for purposes of S.A. 01-1 and MERA, only one binding arbitration actually was imposed.[7]

Even if we were to assume that the oversight board's actions could be considered as twice having imposed binding arbitration, it is not clear that S.A. 01-1 bars such an action. Under such circumstances, we consider the statutory scheme as a whole, the policy underlying the special act and the construction that best effectuates that policy. *Jones* v. *Kramer*, 267 Conn. 336, 348, 838 A.2d 170 (2004) ("[i]t is not our practice to construe a statute in a way to thwart its purpose or lead to absurd results . . . or in a way that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve" [internal quotation marks omitted]); *Collins* v. *Colonial Penn Ins. Co.*, 257 Conn. 718, 728, 778 A.2d 899 (2001) ("[i]n seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement"). In the present case, the statutory scheme strongly suggests that the legislature did not intend to preclude such action under these circumstances. The legislature instructed that "[the special] act is intended to authorize the city to . . . establish a board to review the financial affairs of the city in order to maintain access to the public markets and to restore financial stability to the city, and *shall be liberally construed to accomplish its intent.*" (Emphasis

---

[7] Although we view the oversight board's conduct as resulting in one *binding* arbitration, we reject the union's contention that we should treat the two proceedings as one arbitration for purposes of the time limits imposed because the oversight board adopted as part of the record in the second arbitration its record from the first arbitration. The union points to no authority to support that contention. Indeed, the union waived any objection to the incorporation of that evidence into the record by virtue of its decision not to participate in the second arbitration, just as it did in the first proceeding. Nonetheless, we see nothing improper about the oversight board's treatment of the record under these circumstances.

added.) S.A. 01-1, § 20. The vast authority conferred on the oversight board under S.A. 01-1 reflects the legislature's clear intent that the board must ensure that the terms of the city's collective bargaining agreements adequately protect the city's financial interests. As we have noted previously, unlike binding arbitration under MERA, wherein certain provisions "underscore the importance that the legislature assigned to protection of the parties' autonomous control over their labor relations"; *International Brotherhood of Police Officers* v. *Jewett City*, supra, 234 Conn. 136–37; pursuant to S.A. 01-1, the legislature clearly has divested the parties of that autonomy in favor of board oversight. The prescribed mechanism for doing so in the present case was binding arbitration. To preclude the oversight board from imposing its judgment by rendering a binding arbitration award, at least when due to unforeseeable circumstances beyond its control, contravenes that purpose.[8]

Similarly, it strikes us as counterintuitive that the legislature would have vested the oversight board with

[8] The oversight board had no authority to appoint a replacement for Hajjar, the oversight board member who did not participate in the vote, because the governor is vested with the sole authority to appoint board members other than those state officials expressly named in the special act. S.A. 01-1, § 10 (a). Indeed, although the union suggests that the board should have known that Hajjar was not going to vote and should have taken action earlier to ensure a timely replacement was made, there is nothing in the record to support the union's assertion that the board bears blame for its inability to render a timely award. Although the record reflects that Hajjar did not attend the hearings, the board's rules of procedure, issued pursuant to the special act; see S.A. 01-1, § 10 (b); provide that Hajjar nonetheless could have voted if he reviewed the hearing transcripts prior to the vote. See Organization and Policies of the Waterbury Financial Planning and Assistance Board Relating to Labor Powers, art. II, § 2.17 ("[a]ll members who vote on any issue must, at a minimum, review the hearing transcripts of all hearings on the issue prior to voting if he or she was not present during the live hearing on such issue"). Moreover, Hajjar tendered his resignation approximately two days before the time limit for rendering the award in the first arbitration had expired.

the extraordinary power to supplant the parties' stipulated terms to effectuate its oversight charge but at the same time withhold from it the right to recommence arbitration proceedings under these circumstances. Such a result not only precludes the board from exercising its oversight function, but also has the concomitant result of depriving the parties of the dispute resolution mechanism intended by the legislature.

We also note that construing S.A. 01-1 to permit the oversight board to commence a second arbitration so that it could render a binding award is consistent with our construction of the procedure set forth for vacating an arbitration award under General Statutes § 52-418 (b). That statute, which the union invoked in the present case, provides: "If an award is vacated and the time within which the award is required to be rendered has not expired, the court or judge may direct a rehearing by the arbitrators. *Notwithstanding the time within which the award is required to be rendered,* if an award issued pursuant to a grievance taken under a collective bargaining agreement is vacated the court or judge shall direct a rehearing unless either party affirmatively pleads and the court or judge determines that there is no issue in dispute." (Emphasis added.) General Statutes § 52-418 (b). We have construed this provision and its predecessor as authorizing the trial court to remand a case for further arbitration proceedings when the time has expired to render an award, subject to the limitation that a different arbitration panel must decide the case. See *State* v. *AFSCME, Council 4, Local 1565,* 249 Conn. 474, 479–81, 732 A.2d 762 (1999) (holding that trial court has discretion under § 52-418 [b] to remand to different arbitration panel even if time for rendering award has not lapsed); *Chmielewski* v. *Aetna Casualty & Surety Co.,* 218 Conn. 646, 680, 591 A.2d 101 (1991) ("[a]bsent an agreement of the parties, the specific terms of § 52-418 [b] prohibited the [trial] court from remanding the

case to the original panel of arbitrators, and any issues not decided by that panel will necessarily have to be decided by a new panel"), citing *Aetna Life & Casualty Co.* v. *Bulaong*, 218 Conn. 51, 64, 588 A.2d 138 (1991). Therefore, the time limits attendant to the first arbitration were not dispositive in the absence of a binding award, and the only question under § 52-418 was *who* was authorized to conduct the proceedings, not *whether* the case could be remanded for a second arbitration after the time limit had lapsed for rendering an award. Here, however, the legislature has dictated that the oversight board must serve as the arbitration panel. S.A. 01-1, § 11 (a).

The union contends, however, that the legislature put a framework in place to address the present situation that provides the requisite finality. The union points out that, under MERA, the expired collective bargaining agreement *could* have remained in effect in the absence of a new agreement. Alternatively, the union suggests that the oversight board *could* have acted within the time limits prescribed despite the deadlock by reverting to the parties' June 3, 2004 identical last best offers and treating them as the binding agreement. We disagree with both contentions.

Under MERA, the legislature has provided that, "[i]n the event an agreement expires before a new agreement has been approved by the municipal employer and the employee organization, the terms of the expired agreement shall remain in effect *until such time as a new agreement is reached and approved in accordance with section 7-474.*" (Emphasis added.) General Statutes § 7-475. By its clear terms, this provision simply provides a mechanism to bridge the period between the expiration of a collective bargaining agreement and the commencement of a new agreement—a safeguard for the parties' rights and obligations. It assumes that a new agreement will in fact be reached. Moreover,

simply continuing the terms of the expired agreement does not effectuate the legislature's intent under S.A. 01-1 that the oversight board set the terms of all collective bargaining agreements to meet the city's current fiscal constraints.[9]

Similarly, we reject the notion that the legislature intended that the oversight board should have adopted the parties' joint last best offer as its decision in order to render a timely award. A mere rubber stamp of the parties' agreement would not fulfill the oversight role intended by the legislature. Indeed, that approach essentially would put the parties in the same position as if they were operating under MERA without any of the constraints imposed under S.A. 01-1. See General Statutes § 7-473c (d) (7) ("[t]he parties may jointly file with the panel stipulations modifying, deferring or waiving any or all provisions of this subsection [setting forth procedures for arbitration process]").

Moreover, under the oversight board's own procedures, promulgated pursuant to S.A. 01-1, § 10 (b), parties cannot submit an agreement for consideration to the board until they first submit and obtain approval from the city's board of aldermen. See Organization and Policies of the Waterbury Financial Planning and Assistance Board Relating to Labor Powers, Ex. A, § C, paras. 3 through 5. The parties have stipulated, however, that they did not submit the agreement to the board of aldermen. Therefore, the oversight board could not have proceeded under § 11 (a) (4) to review the agreement.

---

[9] The union contends that the oversight board could have garnered the four votes necessary to issue a decision if the terms of the parties' last best offers were so detrimental to the city. We disagree. We find it unlikely that a board member would change his or her vote simply so that an award could be rendered, even if that member disagreed with the result, and we certainly are not prepared to decide this issue of statutory construction based on such speculation.

The judgment is reversed and the case is remanded with direction to deny the application to vacate the award.

In this opinion the other justices concurred.